## CHARLESTON.

### STATE *v.* W. W. DRIVER.

Submitted April 19, 1921. Decided April 26, 1921.

1. CRIMINAL LAW—*Discretion in Allowing 12-year-old Complaining Witness, With Unusual Intelligence, to Testify, Not Disturbed.*

    The question of the competency of a girl twelve years old, as a witness in a criminal case, is addressed to the sound discretion of the judge, and it is his duty to make a careful and

full examination of her as to age, intelligence, capacity and legal and moral accountability; and where the record discloses that such was done both by the judge and by extended cross-examination by counsel, disclosing in her unusual intelligence, memory and legal accountability, the discretion of the court in permitting her to testify, will not be disturbed. (p. 489).

2. WITNESSES—*Refusal to Appoint Medical Commission to Examine 12-year-old Complaining Witness As to Competency or Credibility Held Proper.*

In such case the judge, upon being satisfied as to her competency by inspection and full examination conducted by himself and counsel in his presence, may properly refuse to appoint a commission of medical experts to examine her and to report to him their opinion of her competency or credibility. (p. 489).

3. CRIMINAL LAW—WITNESSES—*Usual Method of Impeaching Credibility of Witness is to Show Bad General Reputation for Truth and Veracity in Community of residence; Medical Testimony that Witness is a Moron Prone to Tell Lies Held Improper in Impeachment Where Opinion Based On Observation in Courtroom Alone.*

The usual method of impeaching the credibility of a witness as one who will not tell the truth and is unworthy of belief, is to show the bad general reputation of the witness for truth and veracity in the community where she lives by impeaching witnesses who know that reputation. It is not proper to permit medical experts, who have heard only a portion of the evidence given, to testify from what they have heard and seen in the court room, and from observation of the witness on the stand, that she is, what is termed in the medical profession, a moron, and belongs to a kind or class of morons who are prone to tell lies, and that therefore she is unworthy of belief, and no weight should be given to her testimony. (p. 488).

4. INDICTMENT AND INFORMATION—*Indictment Will Not be Quashed Because Grand Juror Finding it Was An Officer.*

An indictment will not be quashed or abated because one of the grand jury, which found it, was an officer. (Sec. 12, chap. 157, Code.) (p. 482).

5. CRIMINAL LAW—*Time for Introducing Admissible Evidence Held Within Discretion of Trial Judge.*

The time at which admissible evidence can be introduced

in a trial is necessarily governed by the trial judge and is within his discretion, and unless that discretion has been abused, and it is plain that prejudice thereby has resulted to a litigant, an appellate court will not reverse.   (p. 496).

6.   SAME—*Allowing Jury in Felony Case to Visit Moving Picture Theater Under Care of Officer Held Not Reversible Error.*

Where the jury, in a felony case, during the recess of the trial, attended by a proper officer, visits a moving picture theater, and it is shown by uncontradicted evidence of the officer and members of the jury that no separation of the jury was had; that they occupied seats together and in view of the officer and each other; and that no person approached or spoke to any of them, no prejudice to the defendant can be presumed, and it is not reversible error.   (p. 497).

7.   SAME—*Improper Evidence Not Considered in Absence of Objection or Exception.*

Assignment of error in the appellate court, predicated on the introduction of improper evidence to the jury, given by a competent witness, will not be considered, when the record discloses that the party complaining neither objected nor excepted to the introduction of the evidence.   (p. 500).

8.   SAME—*Evidence of Former Attempts by Defendant On Same Female Admissible in Prosecution for Attempt to Commit Rape.*

In a prosecution for an attempt to commit rape on a female under the age of consent, evidence of former attempts by the defendant upon the same female is admissible to show the lustful disposition of the defendant toward her, and the existence and continuance of illicit relations between them.   (p. 500).

9.   SAME—*Instructions Must be Considered as a Whole; Refusal of Requested Instructions as to Matters Covered by Instructions Given Held Not Error.*

Instructions must be considered together as a whole, and if one instruction has been given, fully covering a principle of law applicable to the case, it is not error to refuse other instructions to the same effect, although differently expressed.   (p. 501).

Error to Circuit Court, Cabell County.

W. W. Driver was convicted of an attempt to commit rape. A new trial was refused, and he brings error.

*Affirmed.*

88 W. Va.

*Warth, McCullough & Peyton* and *J. W. Perry,* for plaintiff in error.

*E. T. England,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

LIVELY, JUDGE:

W. W. Driver was convicted of an attempt to commit rape and sentenced to confinement for one year in the penitentiary by the Common Pleas Court of Cabell County on June 22, 1920. The court refused to award a new trial, and defendant brings the case here for review on writ of error.

A plea in abatement to the indictment was tendered and refused, and exceptions taken. The plea averred that Jas. H. Marcum, one of the jurors who found the indictment, was, at the time he sat on the grand jury, holding the office of President of the Berkeley Springs Board, and disqualified to act as a grand juror by reason of sec. 2, chap. 22, Acts 1919, which in part says that the persons listed by the jury commissioners and whose names are placed in the ballot box to be drawn as grand jurors "shall not be office holders under the laws of the United States or of this State." Sec. 12, chap. 157 of the Code provides: "No presentment or indictment shall be quashed or abated on account of the incompetency or disqualification of any one or more of the grand jurors who found the same." Does the Act of 1919 repeal sec. 12, chap. 157? Section 2 of chap. 22, Acts 1919 amended and re-enacted sec. 2 of chap. 157, Code, and places the duty of selecting and drawing the grand jury upon jury commissioners, a duty formerly resting upon the county court. Under the old law constables, keepers of hotels or taverns, surveyors of roads and owners or occupiers of steam or water grist mills were ineligible to be selected. The ban against these persons has been removed by the new law, except a constable, who is an officer under the laws of this State. The grand jurors selected under the old law were required to be freeholders, but under the new law that qualification is removed, so that the men listed now for such service shall be of good moral character, who have never been convicted of a felony or any scandalous offense, who shall be bona fide citizens of the State and county for at least one year immedi-

ately preceding the preparation of the lists, and shall not be office holders under the laws of the United States or of this State. In *State* v. *Henderson,* 29 W. Va. 147, the same question arose as is presented here. A grand juror was not a freeholder and the prisoner moved to quash the indictment for that reason insisting that sec. 12 above quoted would be inapplicable, as it would be in conflict with the qualification section—the same objection presented here—Judge JOHNSON said: ''Section 2, which provides that the list, from which the grand jurors shall be drawn, shall contain only freeholders, is clearly modified by sec. 12, which says, in effect, that, if one drawn on the grand jury is not a freeholder, that fact shall not vitiate an indictment found by him. This is a wise provision, because it would be very detrimental to the public interests, if perhaps a hundred indictments should be liable to be quashed or abated, because one, who was not a freeholder, happened to be placed on the list and was drawn as a grand juror.'' The two sections must be read in pari materia and effect given to each. Whether or not a prisoner who has been held to answer an indictment could successfully prevent an officer from being selected as a grand juryman is not necessary to be determined here. It does not arise. But it is clear that after indictment has been found the disqualification or incompetency of one or more of the grand jurors is cured. We can see no good reason for overruling the third point of the syllabus in *State* v. *Henderson, supra.* It is based on reason and good public policy. See also *State* v. *Martin,* 38 W. Va. 568.

A demurrer to the indictment was overruled, but this assignment of error is not urged, and is practically abandoned. We perceive no defect in the indictment.

Agatha Bragg, a girl twelve years old, upon whom the attempted rape was alleged to have been committed, was offered as a witness, and objection was made to her competency to give evidence. The court thereupon went into a lengthy examination of her competency upon her voire dire, and being satisfied of her competency directed the trial to proceed, when the defendant offered to show by Dr. L. V. Guthrie and others that Agatha Bragg was a moral pervert, and not trustworthy. The court refused to hear the proffered evidence and the de-

fendant excepted. The jury then returned to the court room and the trial proceeded. When the State rested, Dr. L. V. Guthrie was examined as a witness by the defendant and after having qualified as an expert by showing his long familiarity and practice as a physician with nervous diseases generally, and with lunatics and imbeciles, he was asked if he was familiar with the class of people known as morons. He answered in the affirmative and proceeded to explain what is meant by the term moron, and defined a moron to be a high-grade mental defective, or a high grade feeble-minded. "It may be applied where there is a moral defectiveness, or where there is a mental defectiveness or where there are both. Usually it is both, but sometimes the defectiveness is in the moral makeup more than the mental, or may be vice versa. The characteristics as to be expected by what I have said in regard to being defective, delinquent, usually get into trouble unless they are carefully guided, and take to evil habits if their surroundings and environment are of evil nature, or if they are permitted to hunt evil associates. They drift toward the bad much more than toward the good. They are usually notorious liars, fail to adjust themselves in their surroundings, and make up very largely the class known as never-do-wells, the class of people who can't get along, and to the layman he does not understand why it is such a boy or girl does not get along, but upon careful examination by persons who are competent to make that examination, the defect is usually detected with more or less ease, but some cases require considerable observation to detect the defect. They may be perfect in their physical make-up. Some of them are very sprightly in their mental make-up, so far as superficial appearances are concerned, but a careful examination by a party competent to make that examination readily detects the defect with the exception of a few cases which require prolonged observation.

"If the individual is perverted morally you would naturally expect them to be liars. The type of moron that you usually come in contact with are notorious liars, and they have a disposition especially in the female sex, their lies usually weave into some sexual question. Now, among the morons we have

a condition known as mythomania, which comes from the word "myth" and "mania"—a myth, something that does not exist, or in the fancy, and mania, a desire or mania to represent facts that do not exist. I usually see nearly all of those cases in the female sex. I have recently seen one in a young man, but they invariably, almost, weave their stories into some sexual question. It may be possible that those desires come to our attention at the time of sexual questions breaking into the girl's conscience. They are usually so notorious as liars that physicians and those who are engaged in handling that class of people make it a rule never to permit themselves to be in the presence of a girl of that type unless there is a witness present, from the mere fact of the liability to make statements against you." He was then asked if he had heard the testimony of Agatha Bragg and replied that he had heard a portion of it, but not all. He was then asked if from what he had heard of her testimony and from what he had heard from the other witnesses concerning her tendency to be mixed up with sexual affairs, what would be his opinion of her condition, morally or mentally, in regard to his definition of a moron. An objection to the question was sustained, and the defendant excepted. The witness was then asked if from what he had heard of her testimony and the statements made by other witnesses concerning the life she had led, and his observation of her, he would say that she was a moron. Objection to this question was sustained and exception taken, and the record was vouched by the statement of counsel that the answer of the witness would be that she is what is known as a moron, and as such is untrustworthy of belief. The witness was then asked to read to the jury from "Medical Defectives, by Barr," the definition of morons, but upon objection he was not permitted to do so and again exception was taken. Dr. Florence Mateer was then introduced and qualified as an expert by stating that she was then chief psychologist in a new institution for the State of Ohio, the Bureau of Juvenile Research, and had been such since September, 1918; that she had had extensive training and study in the examination of delinquents, and especially delinquent children who had been found guilty and sent to an institution. She then gave a

definition of the word "moron" practically the same as that given by Dr. Guthrie, and said: "There are some who are mentally inferior that are perfectly good, but incompetent; they can't hold a job, and they are just inferior,—nice, inoffensive housemaids, the kind that stick by a family forty years and never ask for more than five dollars a week. Then there are other kinds, seemingly bright, what we call verbalistic—that is, they can speak well, tell a clear story, speak readily and are bright enough but all the mind they have goes to delinquency and wrong-doing, and to consequent lying, stealing, immorality, even to the point of murder and all that sort of thing.

"In our experience with defective delinquents as we call them, the moron who is delinquent we usually differentiate from the inoffensive kind. We have found them almost always immoral unless they have been protected in their childhood, if they have a good home and normal parents, which is not the rule, because they inherit their condition, and they will be good themselves because they are trained into the habits of goodness and are too stupid not to keep on the same way; but if they come from poor homes and negligent parents they are subject to whatever delinquency that there might be in the community, and they are consequently delinquent, and lying and stealing and sexual immorality usually go together. In our study of prostitutes in Massachusetts we found that immorality and prostitution were correlated, that is, they came together in about ninety percent of the cases examined." She was then asked if she had heard the testimony of Agatha Bragg, and replied that she had, a part of it, the most of it; and upon being asked if from what she heard she would designate her as a moron, the State objected, the objection was sustained and the prisoner again excepted, counsel stating that if the witness had been permitted to answer, her reply would be that Agatha Bragg is what is known as a moron, and as such is untrustworthy of belief.

We have detailed the evidence, which is the basis of this assignment of error, at some length and, perhaps, with un-

necessary detail, in order that the full import of the proffered testimony may be obtained.

It is not clear just in what class of morons these expert witnesses would have placed Agatha Bragg.   In fact, from the definitions given it would be rather difficult to designate with accuracy the different classes or divisions.   The classification would extend from ''nice inoffensive housemaids who stick by a family forty years and never ask for more than $5.00 a week'' down to those who commit offenses of less or greater gravity, even to the point of murder. Healey's book on the ''Individual Delinquent'' defines morons to be ''those who equal the mental performance of a child between  the ages of 7 and 12 years.''   Dr. Mateer testified that the term moron is a general term invented about 10 years ago by Dr. Goddard, at the time she worked under him, to designate a class who might be either mentally inferior, or morally inferior, and who because of that inferiority were called socially incapable.   They could not get along in the  community because of their impossibility of keeping from breaking the laws, and who consequently needed institutional care, but who were much brighter than the so called imbecile or feeble minded.   The experts would have testified, according to the vouched record, that they would have classified her as a lying moron and unworthy of belief.   The evidence was designed to be an attack upon her truthfulness, aimed at her credibility.   The inference to be drawn from the testimony, if it had been permitted, was that she was an habitual and confirmed liar, because of her mental defectiveness.   It will be perceived that these experts had not heard all of the testimony of and concerning the Bragg girl.   The jury had heard all of it with the attentiveness, discrimination and unbiased judgment usual with jurors sworn to impartially try the issues, and having heard the definition and characteristics of morons from the expert medical testimony they could well determine whether she was a moron and to which class she belonged and whether she was worthy of belief. It was an attempt in a measure to substitute the opinion of the experts for that of the jury, and to tell them that they should disregard her evidence.   Moreover the methods of

impeaching a witness are well defined and are the result of hundreds of years of practical experience.

The three general classes of evidence by which a witness may be impeached are: 1. Character evidence tending to show that the witness lacks truthfulness; 2. That on former occasions he has failed to state material facts, or different or conflicting facts testified to by him on the present occasion; 3. Evidence showing that his present testimony is materially variant from acts done or statements made at other times. Opinion evidence which assails the witness' truth and veracity must be founded on the knowledge of the assailed witness' reputation for truth and veracity among his friends. This is a universal method among English speaking people. In some jurisdictions it extends to the witness' bad reputation for morality, but such is not the method in this State or in the states generally. 1 Greenleaf on Evidence (16th Ed.) sec. 4461. An impeaching witness may include, as an element in estimating his opinion of the general reputation of an assailed witness, his own knowledge of particular acts and conduct; but he cannot testify from his own knowledge alone, the general reputation governs. Hence, a person's knowledge of an assailed witness' reputation gained alone from what has been said against him on the trial, or from his conduct on the trial, is not sufficient to render him competent as a character witness. It was attempted to make the experts competent by showing that they had partially heard the evidence, had observed the girl on the stand, had concluded that she was a moron of the class of liars, and hence unworthy of belief. We are not convinced that the time honored and well settled and defined rule of impeachment of the veracity of a witness should be thus innovated upon. It is yet to be demonstrated that psychological and medical tests are practical, and will detect the lie on the witness stand. "A witness to reputation must be one who by residence in the community, or otherwise, has had opportunity to learn the community's estimate, and the preliminary inquiry, whether he knows the person's reputation, is usually insisted upon." 1 Green-

leaf on Evidence (16th Ed.) sec. 461d.    We think the proffered evidence was properly refused.

The defendant, a short time after the indictment was returned, moved the court to appoint a medical commission to report upon the mental capacity of Agatha Bragg, alleging that she was of the type known as a moron, and incapable of sufficient understanding to apprehend the obligation of an oath, and incapable of giving a correct account of the matters charged in the indictment.    The record does not disclose what disposition was made of the motion but it may be considered as having been refused.    No commission was appointed, and no report made that we can find.    It is for the court to determine whether a witness is capable of understanding the obligation of an oath and has sufficient mind and memory to testify with reasonable intelligence, and if the judge is convinced by personal examination and inspection, we know of no rule or reason why he should invoke the aid of a commission.    The discretion vested in the trial judge on the competency of a child to give evidence is rarely reviewed by an appellate court, and decision either way will not constitute error unless there is a flagrant abuse. *Uthermohlen* v. *Boggs Run Co.,* 50 W. Va., p. 469.    Wharton's Crim. Ev., vol. 1, secs. 357, 719.    We hold that there was no error in refusing to appoint a medical commission to inquire into the competency of the witness, and an inspection of the examination of the child on her voire dire confirms the judgment of the trial judge that she was competent to testify. Her answers were clear and intelligent.    The judge had the opportunity of observing her demeanor, an important factor, which is not accorded to this court by a printed, lifeless record.    Shall we say the trial judge erred?    Besides her evidence given on the trial detailing the facts of and circumstances surrounding the crime was unusually clear for a child of her years, and a severe and extended cross-examination by trained and expert counsel failed to appreciably discredit her account of the unfortunate and sordid occurence in any of its details.

This girl attended the Galliaville public school in Huntington and was in the 6th grade, where she studied history,

physiology, arithmetic, spelling, reading and writing. According to her testimony she first met the defendant in a moving picture theatre on September 21, 1919, when he gave her and her companion, Eva Ratcliff, some chewing gum and twenty cents to pay car fare to Galliaville, where witness lived.    Sometime afterwards he stopped his automobile and took her to the Holderby School which she was then attending.    Afterwards she took four rides with him in his car. On the first of the four trips she was accompanied by Sybil Stanley and they drove out the 16th Street road six or eight miles to a deserted log house by the road side, where she was taken into the kitchen, and where he attempted to have illicit communication with her on a bench.    The Stanley girl remained in the car with instructions to sound the "honk" three times if any one approached the house.    He afterwards took the Stanley girl into the deserted building and remained with her there a short time.    He gave witness one dollar and the Stanley girl fifty cents.    Afterwards she went with him in his car to the same place accompanied by Belva Stanley, a girl about 14 years old, and the same attempt was made, whether successful or not the witness does not fully disclose.    The Stanley girl, becoming curious "peeped through a crack," and plainly saw what transpired.    Defendant on that occasion had a small tube of vaseline, which the Bragg girl obtained, when he left the room hurriedly, thinking some one had taken away his car, and which she gave to the Stanley girl who threw it under the floor through a hole in the flooring.    Afterwards an investigating party took the Stanley girl to the deserted house, and a boy in the party crawled under the house and found the tube of vaseline, which tube and contents were introduced in evidence.    The two girls, Agatha and Belva, testified that defendant told them on this occasion that his name was Chief Davis.    Later another trip was made to the deserted house by the defendant and the two last named girls, when a repetition was had of the former occurrences. On the 19th of January, 1920, the day before defendant was arrested, Agatha made another trip with defendant in his car to the deserted house about 4 o'clock that afternoon, when

there was a practical repetition of the former occurrences. She testified that he told her to say nothing to anyone or they, the girls, would be sent away from home; and that she did not know his true name until after he had been arrested. On these occasions she made no outcry or resistance. and seemed to enter into the relations without objection. There was no material conflict in the testimony of the three girls concerning these trips to the deserted house. On the last visit, when Agatha was not accompanied by either of the other girls, J. D. Keller and his boy, 14 years old, were near the deserted house getting some fodder in a field and noticed the car standing near the house, but saw no one. He gave the time at between 3:30 and 4 o'clock in the afternoon. The next day when the investigating officers came he and his son accompanied them to the house, when his son found the tube of vaseline. He did not see the car come and after noticing it there, and thinking it belonged to the owner of the house whom he desired to see, he started down to see him, but when he got there the car was gone, and had left after he started toward it, going out of view of the car in order to reach the road.

There were several witnesses and circumstances corroborative of the testimony of the young girls. Mrs. Dunkle, a janitress of the Galliaville school building, testified that defendant would drive around the school building and stop and talk with Agatha Bragg, and after his visits she would run off from school. She saw him at the school building on the 19th of January, and had seen the Stanley girl with him in his car on a previous occasion. She never noticed him about the school building until after these girls had been returned to that school from the Holderby school to which the 6th grade had been temporarily sent. He would ride past the school building usually in the mornings. Her attention was especially directed to the defendant's visits and actions after the girl began to run off from school after his visits. Eva McConnell, a teacher in the school, saw him come to the school building several times and talk with the Bragg girl. Her attention was especially directed toward him on account of the actions of the girl. On one occasion

she heard her say to him while he was in his car on the boulevard, "I thought you were going to bring Sybil out with you this afternoon," and then she (the Bragg girl) went on down the boulevard, and he followed her in the car.  She saw him about the school house nearly every day for several days and sometimes twice a day.  She saw him there on the 19th of January, the day before he was arrested.  She testified that Agatha Bragg was not at school the afternoon of the 19th, having been excused for alleged sickness from the afternoon session.  Opal Garland testified practically the same as Miss McConnell as to his frequent visits to the school house and also heard Agatha say to him, "I thought you were going to bring Sybil out this evening."  Pauline Burks, a child of 12 years, saw the defendant on the morning of the 19th of Jannary near the school building as she was going to school and saw him waive his hand to Agatha Bragg; and again in the afternoon at about 3:30 o'clock she was with Agatha going for milk and in front of the residence of a Mrs. King when he again passed in his car, and Agatha left her and went on down the road.  Fay Pritchard on one occasion saw Agatha get into the car with defendant accompanied by Sybil Stanley, Corby Smith, another girl, and a little boy, in front of the Baptist church on Fifth Avenue, and she  thought it was while Agatha was attending the Galliaville school.

Dr. Gerlach, a witness for the defense, saw Agatha at the office of the Chief of Police on January 20th, the day defendant was arrested, and at the request of the Chief made a physical examination of her genital organ and found  no departure from normal, although she complained of a great deal of pain when he inserted one finger into the vagina. He found no bruises or evidence that she had been molested in any way.   There was some contradiction of this witness' statement by others who testified that he had stated that he found the child had not been entered, but that he found bruises indicating the application of some force.

Three witnesses, Arrington, Herald and Johnson, testified that Agatha Bragg's reputation for truth and varacity in

the neighborhood where she lived was bad, and that they would not believe her on oath.

The defendant testified that he had met Agatha Bragg at a picture show, and the next time he saw her was out on the boulevard while he was in his car taking his boy to the High School.  After accounting for his movements and whereabouts on January 19th up until about 3 o'clock in the afternoon, he stated that he left home and came down to the Huntington Spring Bed Company, where he stayed about one half hour and went from there out to Galliaville to see a Mr. Sizemore about selling his car to him, but, not seeing him, came back toward town and was on his way to the office of a brick company when Agatha Bragg stopped him on the hill just the other side of the boulevard about 4:30 or 5 o'clock, and got in the car and he drove her down to the Eighth Street car line where he left her, and from there drove to the brick company's office, reaching there about 5 o'clock P. M. and staid there a considerable time afterwards.  This was the only ride the girl took in the car that day.  He then gave an itinerary of his travels as a salesman from the 29th of December, 1919, until the 18th of January, 1920, showing that he was not in the city of Huntington between those dates except on the 5th of January and the 18th of January, when he returned from Virginia.  He denied that he had taken the trips to the deserted house, and flatly contradicted the evidence of the girls in that particular.  S. T. Drummond, Superintendent of the Huntington Spring and Bed Co., corroborated the defendant's testimony by stating that he came to his place of business on January 19, about 3 o'clock and staid there an hour or an hour and a half; and Dorsey Evans testified that defendant came to the brick yard office about 5 o'clock P. M. of January 19, on business.  Dr. L. T. Vinson, C. M. Wallace, Dan Holton and G. A. Northcott, all men of high character and standing, testified to the good reputation of the defendant for honesty and good citizenship in the community.  After some rebuttal evidence of minor importance had been given, the State recalled the defendant, who was asked if on one occasion he did not show and give to Sybil Stanley

three pictures of naked women, and ask her to strip off her clothes and let him take her picture with a kodak, and which he denied. He was also asked if he was not at the home of Mrs. Stanley, or passing her home, when she told him he must not again take any of her children in his car and told him he was a son of a bitch, and if he ever did so again she was going to kill him. This he denied also. To this examination the defendant's counsel excepted and objected, not to the form of the questions, but because of the time in the trial when the foundation for impeachment was laid. Then Mrs. Stanley was recalled and contradicted the defendant by detailing her conversation with him and her threats against him for taking her child into his car; and Sybil Stanley was also recalled and stated that defendant had given her pictures of naked women, and had asked her to let him take her nude picture. Exceptions were taken to the introduction of this evidence, and it is here insisted upon as error.

Other evidence showed that Sybil Stanley had confessed to the theft of various articles, and was incorrigible. It was clear that Agatha Bragg would run away from home, was unmanageagble and had staid all night in a livery stable with another girl and two boys, and was generally loose in her morals and virtue. She and the two Stanley girls had been previously adjudged as incorrigible and delinquent by the juvenile court and ordered to be taken to some state reform institution, but the order was held in abeyance for the purpose of hearing their evidence on the trial of this case, and to save the expense of their return for that purpose.

The attempted rape was alleged to have been committed on the 19th of January, 1920, the indictment was returned on February 6, 1920, and on February 11th, following, the defendant moved the court to appoint Dr. L. V. Guthrie, a physician, to make a complete physical examination of Agatha Bragg, which was denied, and exception taken. Just what physical examination was contemplated is not set out in the motion but it is now urged that if an examination had been made it would have strengthened the testimony of Dr. Gerlach, who examined her the day following the alleged

crime, and testified as hereinbefore set out.    The only por-
tion of Dr. Gerlach's evidence which was in question was
whether or not there were any bruises  or abrasions.    He
testified that there were none.    Other witnesses who heard
his statements, made immediately after the examination,
testified that he said there were some bruises of a slight
character.    Examination on February 11th would not likely
have revealed evidences of slight bruises made on the 19th
of January, and evidences of no bruises at that later date
would have had very little if any probative force.    There
was no claim that she had been entered, the State did not
attempt to prove that she had been, and the proposed exam-
ination could have been of no benefit to the prisoner in that
regard.    It might have been detrimental, if, perchance the
examination had revealed an effective entrance, although it
might have been effected by some one since the day of the al-
leged attempt by the defendant.    It is somewhat doubtful if
she could have been forced to undergo an examination of her
sexual organs, especially at that late date.    The question
arose in *Whitehead* v. *State*, 39 Tex. Crim. Repts. 89.    The
State was the prosecutor, and the order requested was to
require the prosecutrix, who was a witness, to undergo an ex-
amination of her private parts.    The court refused the or-
der, and the appellate court, in sustaining the lower court,
said:    "In the nature of things the propriety of such an
order must usually rest largely in the discretion of the trial
court, and it would only be in the case of a plain abuse of
such discretion that the appellate court would interfere,"
citing 1 Thompson on Trials, sec. 862.    Under the facts
here, we think the court properly refused the motion.

The evidence of Agatha Bragg, Sybil Stanley and  Mrs.
Stanley, concerning the exhibition to the girls of pictures of
nude women by defendant and his request to take kodak pic-
tures of the girls while nude, is relied upon as error on the
ground that it was irrelevant and in no way tended to evi-
dence the crime alleged in the indictment, and was intro-
duced after the evidence in chief had been given, at an im-
proper time in the trial, after rebuttal evidence had begun.
We think the evidence was admissible as having a bearing

upon the commission of the offense. It tended to show the purpose for which defendant was inducing these girls to enter his car culminating in the trips to the abandoned house. The evidence that he often came to the school house, and sought interviews with the girls, taken by itself might be construed to be for an innocent and proper purpose, but, viewed in the light of subsequent events, was permissible to show a sinister design, his opportunity for carrying out that design and in corroboration of the evidence of the two girls. The nude picture incident was indicative of the motive for seeking their society. It must be borne in mind that this attempt at rape was not by force or putting in fear. It was apparently consented to and possibly desired. No outcry or resistence was made, no disarrangement of apparel, no complaint on her part afterwards. It was the school authorities and the officers of the law who became suspicious, and, with the parents, elicited the confessions, made the investigations and began the prosecution. Had the girl been over the age of consent, there could have been no case under this evidence. The statute makes the offense rape if consummated. The child, under the law, cannot consent. The exhibition of these nude pictures, if true, was an assault upon her morality, a breaking down of her modesty, if she had any, and clearly indicative of his state of mind toward her, his intent afterwards consummated. Intent is a necessary element of crime. Evidence tending to show intent is always admissible. If it was admissible evidence, and we think it was, the time in the trial at which it was presented is of little consequence. The trial court's discretion in the mode of conducting trials and the order and time of introducing evidence will not be disturbed, unless grossly abused. *McManus* v. *Mason*, 43 W. Va. 196; *Goodwin* v. *Tony Pocahontas Coal Co.*, 88 W. Va. 49, 106 S. E. 76; *Railroad* v. *Stimson*, 14 Peters 463; *Smith* v. *Mayer*, 3 Col. 210; and *Godbe* v. *Young*, 1 Utah 57. Even where a case has gone to the jury the courts have permitted them to be recalled and further evidence taken. *Livingston's Case*, 7 Gratt. 658. ''Whether a party shall introduce further evidence after that of the adverse party has been heard is a

matter of sound discretion of the court, and its exercise will rarely, if ever, be the cause of reversal." *Steele* v. *Littleton,* 77 W. Va. 809 and cases there cited.

Error is assigned because the jury was placed in the charge, on one or more occasions during recess of the court, of James A. Poteet, the regular janitor of the court house, who had been sworn in as a deputy sheriff upon the request of the sheriff at the beginning of the term, for that purpose. The orders of the court entered on the 22nd day of June showed that the jury was placed in charge of James A. Poteet, specially appointed by the court, who was sworn to keep the jury together and not allow them to separate, nor to converse with them himself touching the matter of the trial, nor to allow any other person to converse with them on any subject without leave of the court, and return them to court at 9 o'clock the next morning; but on motion of the defendant the order was changed to show that the jury was on that day committed to the charge of Clingenpeel, deputy sheriff, who was sworn etc., and that the following morning the jury was brought into court by Jas. A. Poteet, who had been sworn in as special deputy for the June term of the court. The affidavit and examination of Poteet showed that he was duly appointed and sworn in by the trial court as a deputy to take charge of the jury at the adjourning hour and duly sworn to keep the jury together, not let them talk etc., and that he took the jury that night to a motion picture house to view a motion picture therein, and set them all down together in one row except one of them, who sat immediately to his left and two who sat in front in the second row, the intervening seats being broken down. The jurors were all in his view during the entire time and no one talked to any of them. They all came out together, in his charge, and went to an ice cream parlor and sat down together, by themselves, and ate some ice cream, no one being near to them or any of them, and no one spoke to any of them while there. On this occasion the jury was first put in custody of Clingenpeel, regular deputy, who turned them over to Poteet at 7 o'clock P. M., and they remained in his custody continuously from that time until the next morning, when they re-

turned into court, and during all that time were not sep-
arated and no one spoke to any of them.    The sheriff also
testified that Poteet was sworn in by the court, at his sug-
gestion, for the term as deputy, and continued to act as
such, and was such deputy at the time of the trial of the
defendant, W. W. Driver.    One of the jurors, C. C. Dusen-
berry, was also sworn and corroborated deputy Poteet, and
stated that they were all together at all times both in the
picture show and when they got ice cream and no one
spoke to any of them on either of the occasions.    This juror
went that night, accompanied by the entire jury, to his resi-
dence, which he entered by a side door and obtained a night
shirt, this he accomplished in about two minutes and saw
no one and spoke to no one.    Four other jurors corroborated
the statements made by Poteet, Clingenpeel and Dusenberry.
The evidence of the other jurors was not taken because they
had been discharged and were no longer in attendance upon
the court.

Was it error because the jury was placed in the custody of
Clingenpeel, deputy, on the adjournment of the court on·
the 22nd and brought back to the court room on the follow-
ing morning by deputy Poteet?    The same question arose
in *State* v. *Poindexter*, 23 W. Va. 812.    In that case the
jury was placed in the custody of the deputies and returned
in the custody of the sheriff, and the court held it was not
error.    Sec. 6 of chap. 159 of the Code requires that the
jury, after being impaneled and sworn in a felony case, shall
be kept together by the sheriff, *or other officer* until they
agree upon a verdict or are discharged.    It would be un-
reasonable and extremely technical to hold that if a jury
should be placed in the custody of an officer, and that officer
should be stricken with illness or die, then another officer
could not take custody, and in consequence, the trial would
cease.    Clingenpeel delivered the jury to the custody of
Poteet after supper, but for what reason or necessity it does
not appear.    The main reason of the statute is that the jury
shall be kept together by a proper officer or officers, and the
record conclusively shows that this was done.    The judge
may take charge of a jury in the temporary absence of the

sheriff to whom they have been committed.    *Phillips* v. *Commonwealth,* 19 Gratt. 485.    It is not necessary that a deputy having a jury in charge during a trial for felony should be sworn every day to keep the jury together and not permit anyone to talk to them etc., the law requires him to perform that duty without being sworn each day.    *State* v. *Shores,* 31 W. Va. 492; *State* v. *Ice,* 34 W. Va. 244; *State* v. *Kellison,* 56 W. Va. 690.    Poteet was sworn as a special deputy at the beginning of the term, and at noon recess of the day when custody was delivered.    The law in this State is so well defined concerning the separation and misconduct of jurors while in charge of the officer that it would serve no useful purpose to again review it.    The leading case is *State* v. *Cartright,* 20 W. Va. 32, followed by *State* v. *Robinson,* 20 W. Va. 713; *State* v. *Harrison,* 36 W. Va. 729; and the well considered case of *State* v. *Cotts,* 49 W. Va. 615. In the last case the law is well stated as follows: ''But where there has been an improper separation or misbehavior of the jury during the trial, if the verdict is against the prisoner, he is entitled to the benefit of the presumption that the irregularity has been prejudicial to him, and the burden of proof is upon the prosecution to show, beyond a rasonable doubt, that the prisoner has suffered no injury by reason of the separation  or misbehavior; and if the prosecution fails to do this, the verdict should be set aside.''    In that case the jury had been separated into two parts, each in charge of a deputy, one part going to the camp grounds and the other remaining in the court house yard.    That night they all were taken to see the accidental burning of a building, which had attracted a large crowd; and two of the jurors had gone into a cigar store for cigars, leaving the other jurors and deputy on the sidewalk; and there were several instances where different members of the jury had been spoken to on immaterial matters by outsiders.    But it was clearly shown by affidavits that nothing of a prejudicial nature to the injury of the defendant transpired.    The presumption of injury was successfully rebutted.    The visit of the jury to the picture show may have been an irregularity, as tending to take their minds from more carefully and ef-

fectually deliberating on the grave case then in their keeping, but the picture, so far as the record shows, would not have that tendency, and the affidavits clearly show there was no separation or misconduct. The ice cream incident is of no importance. The jury was kept together and separate from all other persons while in the room and spoke to no one. There is no more misconduct in procuring ice cream for the jury in this manner than there would be in procuring their meals at a restaurant. Nor can we see any prejudicial conduct in allowing Juror Dusenberry to get his night shirt at his home. His affidavit clears all doubt.

Another assignment of error is the action of the court in allowing the Bragg and Stanley girls to testify about attempts made by the defendant prior to the 19th of January, 1920, because they constituted separate offenses, which he was not prepared to defend. We find no objection or exception taken by the defendant on the record. He has waived the introduction of this evidence. Even if objection had been made, the evidence would have been properly admitted to show the lustful disposition of the defendant, and that such other illicit or adulterous acts between him and the girl under the age of consent tended to corroborate the particular attempt charged in the indictment. *People* v. *Gray,* 251 Ill. 431. "The general rule that evidence of other crimes is inadmissible does not apply to proof of other acts of sexual intercourse between parties in statutory rape cases, that is, in prosecutions for rape on a female under the age of consent, even though such other acts constitute separate and distinct crimes." 16 C. J. p. 608, title "Rape." See also 1 Wigmore on Evidence, sec. 398 et seq.

Only one instruction was given for the State and defendant asserts it to be erroneous "because it singled out certain evidence and made said evidence prominent to the exclusion of all other evidence." A reading of the instruction answers the objection. The instruction is as follows: "The Court instructs the jury that if you believe from all the evidence in the case beyond a reasonable doubt that the defendant on the 19th day of January, 1920, or prior to said date, took Agatha Bragg a female child under the age of fourteen years

into the house and laid her on a bench in said house as
testified to by the witnesses in the case and while in that
position he pulled up her clothes exposing her privates and
that the said W. W. Driver with intent to have carnal knowl-
edge of said Agatha Bragg and while in that position placed
his male organ against the privates of Agatha Bragg with
intent aforesaid that then the said W. W. Driver is guilty
as charged in the indictment even though the jury believes
from the evidence in the case that said conduct of said de-
fendant was with the consent of said Agatha Bragg.'' Just
what particular evidence is made prominent by this instruc-
tion to the exclusion of other evidence we fail to see. The
instruction is based upon all the evidence from which the
jury may find the defendant guilty as charged, if they be-
lieve beyond a reasonable doubt that the act was committed
in a particular manner and with intent to have carnal
knowledge of Agatha Bragg.

The defendant offered six instructions, the first three of
which were given, and the others refused. The instructions
refused were all to the effect that the defendant was not
guilty unless he had intent to commit the crime as charged.
The instruction given by the State fully covered this point,
and told the jury that they must believe beyond reasonable
doubt that the defendant had intent to have carnal knowledge
of Agatha Bragg, and did certain acts with intent aforesaid,
before they could find him guilty as charged. It is not
proper to repeat instructions stressing the same point, or
theory, although the wording may be different or variant.
Instructions are designed to define for the jury, and to di-
rect their attention to, the principles of law which apply to
and govern the facts established. They must be considered
as a whole, and if a legal principle is fully set out in one in-
struction it will not be error to refuse another or others con-
cerning the same. Where instructions given, no matter on
which side, fairly and clearly lay down the law of the case,
it is not error to refuse others on the same points, though good.
*Nicholas' Case,* 91 Va. 742; *McCray* v. *Fairmont,* 46 W. Va.
442; *State* v. *Prater,* 52 W. Va. 132; *Meyers* v. *Falk,* 99 Va.
385.

We have closely scanned the record for error. and have carefully considered the assignments of error, and have been unable to find any upon which we could justify reversal.

Upon the general assignment of error because the verdict was contrary to the law and the evidence, we have considered all the evidence, and have concluded that the evidence for the State, although coming in part from apparently unreliable sources and contradicted flatly by the defense, was sufficient to sustain the verdict. We cannot invade the province of the jury as to the credibility of the witnesses and the weight to be given to their testimony and the circumstances.

We affirm the judgment of the lower court.

*Affirmed.*