FRANKS *v.* STATE.

(*Nashville*, December Term, 1947.)

Opinion filed July 17, 1948.

C. L. BOYD, of Waynesboro, for plaintiff in error.

NAT TIPTON, Assistant Attorney-General, for the State.

MR. JUSTICE PREWITT delivered the opinion of the Court.

Defendant, Jay Franks, was convicted of first-degree murder of Hughes Lynch and his punishment fixed at 99 years' confinement in the State prison. He has appealed and assigned errors.

Deceased, Hughes Lynch, was beaten to death at his home about eleven o'clock on Saturday night, September 6, 1947. The killing took place on State Road 114, about five miles southeast of Clifton, in Wayne County. Deceased was a soldier in the United States

Army and was home on terminal leave. Defendant was a married man and lived in the vicinity of the home of deceased. During the absence of deceased from his home, defendant became intimate with his wife, and the theory of the State is that this intimacy lay at the base of the homicide. Deceased returned home on terminal leave about a week before the date of the killing. Evidently deceased had been informed of the relations of defendant with his wife while he was in camp, as the father of deceased testified that he talked with defendant about these relations.

The home of deceased was diagonally across the road from that of his father. The first intimation that anyone had of any trouble was when Mrs. Lynch, wife of deceased, came to the home of the father and informed him that her husband had been hurt. Hastening to the scene, the father and sister of deceased found the body of the latter lying on the back porch of his home clad in shorts. There were five wounds on the skull of deceased, and the physician summoned testified that either one of the five would have proven fatal. Blood was found in various places in the bedroom which deceased occupied.

The principal witness for the State is the seven-year-old daughter of deceased. This little girl testified that she awoke during the night for the purpose of answering a call of nature and going out on the back porch she saw her father standing at the water tank, and that two men, one of whom she said was defendant, were standing under a tree nearby. She further testified that after completing her mission, she went back into the house and a few minutes later she heard the sound of blows toward the back porch.

Defendant was arrested shortly thereafter and questioned by the district attorney general and the sheriff. He made a statement in substance to them that he had been intimate with deceased's wife and he had learned of threats made by the father of deceased against him on account of these illicit relations. In this statement he stated that on Friday before the killing on Saturday night he met the wife of deceased in a pasture and told her deceased had threatened to kill him. He asked her to write a note imitating the handwriting of deceased as nearly as possible, and also dictated the contents of the note, so it would appear that deceased had left the country. He told her that after he killed deceased he would undertake to dispose of the body. Defendant also stated that he told the wife of deceased to send him to the pasture after the cows the next day, the day of the homicide, and he went to the pasture with a shotgun but deceased did not come.

In this statement defendant further stated that on the night of the killing he went to the home of the deceased and picked up a stick on the way; that he went near the back door and waited for about 10 or 15 minutes and hearing no sound inside, knocked on the back door three times, as prearranged with deceased's wife, and deceased came to the door, opened it and said, "What in hell are you doing here?" Defendant also further stated that he then struck deceased on the head with the stick and he fell to his hands and knees; that he got up, turned and started in the house and hallooed for help; that he hit deceased the second time with the stick and he fell; that his wife started to wash his head and then went in the house; that he asked her if she had written the note and when she advised him in the affirmative, he struck deceased the third time on the head with this stick.

On Monday, following the killing on Saturday night, a note was found under the linoleum rug in a room of the home of deceased, with his first name signed thereto, stating that he was leaving and was not coming back. The testimony of deceased's sister, who was familiar with his handwriting, was to the effect that this note was not in the handwriting of deceased.

Defendant testified that on a number of occasions the father of deceased had threatened him, the substance of these threats being that if he and deceased ever got him out alone they would beat him up. He also testified that when he saw deceased's wife out in the pasture on Friday afternoon she told him that deceased had told her he was going to kill him—that they both could not live in the same neighborhood. Defendant admitted that he saw deceased's wife in this pasture on Friday afternoon, and also admitted that he told her to write a note but denied that he told her what to put in it. Defendant also denied going to the Lynch pasture on Saturday afternoon but testified that he went to Clifton.

Defendant further testified that on the night of the killing he left the home of his brother-in-law in his truck and left the truck in some bushes near the home of deceased; that he went to the back door of deceased's home and picked up the stick to protect himself; that his purpose in going there was that deceased's wife had told him her husband was going to Clifton, a nearby town, to a cakewalk that night and he wanted to tell her to meet him in town on the following Monday; that before knocking on the door he waited for 10 or 15 minutes and hearing no sound, knocked on the door three times; that deceased immediately opened the door and said, "What in the God damn hell are you doing?"; that he

then struck deceased one time on the head with this stick and he fell on his hands and knees, then jumped up and turned around in his face and he hit the second time; that when deceased started to get up after he had hit him the second time, he then hit him the third time and knocked him back down. Defendant admitted that he saw no weapon in the hands of deceased, and did not claim that deceased made, or attempted to make, an assault upon him. Defendant denied that he saw the little girl of deceased on that night.

We are of opinion that the jury was well warranted in concluding the killing came from deliberation and premeditation. Defendant went to the home of deceased at this late hour at night armed with a stick. The proof is that deceased's head showed five wounds. The medical testimony is that these were separate wounds and of such a nature as to be incapable of having been produced by the same blow. From the testimony of the little girl, and also from the medical testimony and the physical facts, the jury was warranted in concluding that deceased was called out of his home and that defendant took his life with this stick deliberately. From this evidence we think the jury was justified in finding that the purpose to kill deceased had been formed by defendant a day or two before the killing, and it is well settled that where the purpose to kill is formed coolly and deliberately, it is murder in the first degree, even though it be executed in passion.

In *Leonard* v. *State,* 155 Tenn. 325, 337, 338, 292 S. W. 849, the Court quoted approvingly from Vol. 29, Corpus Juris, pages 1116-1117; 40 C. J. S., Homicide, sec. 33, as follows: ''However, passion does not always reduce the crime since a man may deliberate,

may premeditate, and may intend to kill after premeditation and deliberation, although prompted and to a large extent controlled by passion at the time. If the design to kill was formed with deliberation and premeditation, it is immaterial that defendant was in a passion or excited when the design was carried into effect.''

We think the facts in the instant case present a stronger state of facts than did the *Leonard Case,* in that in this case the killing could not be said to have been done under any passion that the law recognizes.

■ It is insisted that the officers guarding the jury were not properly sworn. The record shows that on the first morning of the trial six veniremen were accepted as prospective jurors and at the noon adjournment two officers were properly sworn to guard them. Defendant contends that the officers should have been resworn after the remaining jurors were accepted. We are of opinion that the duty of the officers is a continuing one after their oath, and this duty also extends to jurors later selected. *Johnson* v. *State,* 67 Tenn. 450; *State* v. *Driver,* 88 W. Va. 479, 107 S. E. 189, 15 A. L. R. 917.

It is next insisted that the trial judge was in error in permitting the seven-year-old daughter of deceased to testify. This little child was examined by counsel and upon her examination; in answer to a question as to what becomes of children who do not tell the truth, made the statement that they did not go to Jesus. We think this evidence shows a recognition of a state of future punishments and rewards. We have no case in this State directly in point, but we quote from the case of *Wheeler* v. *United States,* 159 U. S. 523, 525, 16 S. Ct. 93, 40 L. Ed. 244, 247, as follows: ''The decision of this question rests primarily with the trial judge, who

sees the proposed witness, notices his manner, his apparent possession or lack of intelligence, and may resort to any examination which will tend to disclose his capacity and intelligence, as well as his understanding of the obligations of an oath. As many of these matters cannot be photographed into the record, the decision of the trial judge will not be disturbed on review, unless from that which is preserved it is clear that it was erroneous."

▇ In *McElroy* v. *State,* 146 Tenn. 442, 242 S. W. 883, this Court, in passing on the ruling of the trial judge upon the qualifications of expert witnesses, held that it will not reverse the trial court on his holding with reference to the qualifications of experts unless it can see that he was clearly in error and there was no abuse of discretion. In the present case the trial judge had the little girl before him and could judge of her intelligence. After all, the personal observation of a child of tender years furnished the safest guide to its ability to testify, and we are of opinion that the trial judge did not abuse his discretion in permitting the little girl to testify.

The next insistence complains of certain statements made in the argument of counsel over the admissibility of evidence to the effect of the alleged existence of a conspiracy between defendant and deceased's wife. The first place this was mentioned is found at page 87 of the record and was merely stating the theory of the State. Upon objection by defendant, the trial judge sustained the exception to the admission of the testimony sought to be introduced.

A further insistence complains of the admission in evidence of the note purported to have been written by

deceased and found under a linoleum rug in his home on Monday following his death. The objection is that the note was not shown to be in the handwriting of defendant nor placed where it was found by him.

■ ■ There is testimony in the record consisting of defendant's statement and also his own admission that he had told deceased's wife to write a note. In his confession defendant told of having substantially dictated to her the contents of the note to be written. The evidence shows that she was in position to have placed this note where it was found. The finding of the note in the same tenor as detailed by defendant's confession, in the home of deceased, was corroborative of his statement. We think the jury was justified in inferring that deceased's wife had written this note, as suggested by defendant, and placed it where it might be found, thus showing the premeditation and deliberation with which the killing was committed. Any effort to conceal the crime on the part of the slayer is admissible as showing premeditation. *Mullendore* v. *State*, 183 Tenn. 53, 191 S. W. (2d) 149.

The final insistence is that the trial court erred in declining to instruct the jury upon the law of self-defense.

■ We do not think the trial judge was in error in declining to instruct the jury upon the law of self-defense for two reasons:

(1) From the testimony of defendant himself it appears that he armed himself with the club with which the homicide was committed and went to the back door of the home of deceased and knocked, and upon being asked what he wanted and without waiting for any overt act, or without knowing whether or not deceased was armed, he immediately struck him, from the effects of

which he died. *Myers* v. *State,* 185 Tenn. 264, 206 S. W. 2d 30, was a different case. In that case the deceased had made a number of recent threats against the life of the defendant and at the time of the homicide was engaged in a struggle with him over the possession of the pistol with which the homicide was committed. In the present case the threats testified to by defendant, with one exception, came from the father of deceased, and they were to the effect that "when me and Hughes catch you out alone, we will beat you up." There is no suggestion that the father of deceased was present when defendant appeared at the back door. Furthermore, when defendant went to the back door of deceased's home on this occasion, he was entitled to ask defendant what he was doing at that hour of the night. No element of self-defense could arise from this inquiry.

In Warren on Homicide, Perm. Ed., Vol. 4, sec. 338, pp. 278-279, it is said: "It is not necessary to instruct the law of self-defense or a particular phase thereof, where the evidence shows the contrary, and requests for such instructions are properly refused. Thus, for instance, it is proper to refuse to instruct on the law of self-defense where the evidence shows that no act was done by deceased at the time of the killing, which manifested an intention on his part to take the life of defendant or to inflict any serious bodily injury upon him, as, where all the eyewitnesses testified that deceased made no effort to harm accused; where there is undisputed evidence that defendant provoked the difficulty; . . ."

*Myers* v. *State, supra,* does not hold that an instruction on self-defense must be given in all cases. See note to 19 Ann. Cas. 120 (1911).

(2) There is another reason why the trial judge cannot be put in error for declining to charge the law of

self-defense. It appears that at the conclusion of the testimony defendant withdrew his plea of not guilty and pleaded guilty to voluntary manslaughter. By this plea he admitted killing deceased unlawfully, that is, not in his own necessary self-defense. When defendant pleaded guilty to voluntary manslaughter it was an admission by him that the killing was not in his own necessary self-defense, and this constituted, in law, a withdrawal of that defense. When defendant pleaded guilty to voluntary manslaughter, even though the plea was not accepted by the prosecution, he admitted the killing was without justification, and this admission was negatived by the plea that the killing was in his own necessary self-defense. We, therefore, cannot hold the trial court in error for declining to instruct the jury as requested by defendant.

We have disposed of all assignments of error except the last one in a rather lengthy opinion. The last assignment of error challenges the verdict of the jury and the judgment of the trial court thereon. Defendant contends that in case of an affirmance the judgment fixing the definite sentence of 99 years in the penitentiary should be modified so that the sentence will be for some period over 20 years and not more than 99 years in the penitentiary. In other words, defendant insists that the indeterminate sentence law applies where there is a conviction for murder in the first degree.

Williams' Code, sec. 11766, provides as follows: ''Whenever any person over eighteen years of age is convicted of any felony or other crime and punishable by imprisonment in the penitentiary, with the punishment for said offense within minimum and maximum terms provided for by law, the jury in addition to finding the

defendant guilty shall fix the maximum term of the convicted defendant and its form of verdict shall be: 'We find the defendant guilty as charged in the indictment,' or 'We find the defendant guilty of . . (whatever may be the offense charged), and fix his punishment at imprisonment in the penitentiary for not more than . . . years,' and the court imposing judgment upon such verdict shall not fix a definite term of imprisonment, but shall sentence such person to the penitentiary for a period of not more than the term fixed by the jury, making allowance for good time as now provided by law."

It will be noted that the section just quoted deals with felons where the crime is punishable by imprisonment in the penitentiary.

Williams' Code, sec. 10772, provides as follows: "When any person is convicted of the crime of murder in the first degree, or as an accessory before the fact of such a crime, it shall be the duty of the jury convicting him in their verdict to fix his punishment, which punishment shall be death in the mode prescribed by law for infliction of the death penalty in capital cases, or the jury may, if they are of opinion that there are mitigating circumstances, fix the punishment at imprisonment in the penitentiary for life, or for some period over twenty years."

Defendant relies on the recent case of *Coursey* v. *State*,[1] Rutherford Criminal, unpublished opinion by BURNETT, J., handed down May 3, 1948, wherein this Court affirmed a conviction for rape, with a sentence of 18 years in the penitentiary, and modified the sentence so as to read: "The commitment will be for an indeterminate term of not less than 10 years, the minimum fixed by statute, nor

---

[1]Not designated for Publication.

more than the maximum fixed by the jury." Code, sec. 10781.

In a conviction for murder in the first degree in the unreported case of *Wright* v. *State*,[1] Houston Criminal, December Term 1934, the Court said: "The judgment committing defendants to imprisonment from forty or fifty years was erroneous. It will be modified so as to conform with the statute. Sections 10771, 11770; *Woods* v. *State*, 130 Tenn. 100, 169 S. W. 558, L. R. A. 1915 F, 531. The commitment will be for an indeterminate term of not less than twenty years, the minimum fixed by statute, nor more than the maximum fixed by the jury."

In *Adams* v. *Russell*, 179 Tenn. 428, 432, 167 S. W. 2d 5, 7, after quoting the above language from *Wright* v. *State*, *supra*, the Court said: "The court assumed, without discussion, that the indeterminate law applied in this first-degree murder case."

In *Mays* v. *State*, 143 Tenn. 443, 448, 226 S. W. 233, 234, it was said: "As the law now stands, there is no abstract punishment provided for murder in the first degree. The act of 1919 imposes upon the jury the duty of assessing the punishment in such cases within certain limits. The punishment that may be fixed by the jury ranges from death to imprisonment in the penitentiary for some period over 20 years."

▉ After a careful reading of the Code sections above set out, we are of opinion that the indeterminate sentence law does not apply to capital offenses of murder and rape. The punishment prescribed for rape is almost identical with the punishment prescribed for murder. We do not think the Legislature had in mind capital offenses when it passed the indeterminate sentence law. This being our view of the matter, the expressions in

*Wright* v. *State, supra, Adams* v. *Russell, supra,* and *Coursey* v. *State, supra,* are disapproved, and we hold that the indeterminate sentence law does not apply to the offenses of rape and murder.

All assignments of error are overruled and the judgment is affirmed.

All concur.

GAILOR, J., (concurring).

I wish to add a few words to explain my concurrence with the Court's action on the last assignment of error. The Indeterminate Sentence Law (Code sec. 11766) is limited to felonies punishable by imprisonment in the penitentiary "with the punishment for said offense within minimum and maximum terms provided for by law." I construe the effect of "provided for by law" to be that Code sec. 11766 is limited to those crimes for which the statute fixing the punishment provides expressly that the sentence shall be for an indeterminate term within minimum and maximum limits and that the Indeterminate Sentence Law does not apply to those crimes for which no provision for indeterminate sentence is made by the statute. Thus the law applies to a conviction for murder in the second degree because the statute fixing punishment for that offense expressly provides (Code sec. 10773) for imprisonment "for not less than ten nor more than twenty years." But the Indeterminate Sentence Law does not apply to convictions for murder in the first degree (Code secs. 10771, 10772) or for rape (Code sec. 10781) because the punishment for these offenses without mitigating circumstances, is death and not imprisonment in the penitentiary, and because sections of the Code fixing punishment for murder in the first

degree and rape do not provide for an indeterminate term of imprisonment within minimum and maximum limits.

With this explanation, I agree with the action of the Court on the last assignment of error and with the disposition of the case.