# CHARLESTON

## BANK *v.* HANNAMAN et al.

Submitted June 14, 1907.   Decided January 21, 1908.

1. TRIAL—*Questions for Court and Jury.*
      While it is for the court to determine the competency of wit-
   nesses to testify, the value and weight of the testimony given by
   them is a question for the jury. (p. 361.)

2.  SAME

    It is error to give an instruction based upon one particular fact in evidence to the exclusion of other material facts involved in the issue tried.  (p. 365.)

3.  BANKS AND BANKING—*Payment of Forged Notes—Estoppel—Grounds —Silence.*

    Where negotiable notes purporting to have been made by H. payable to A. T. B. and J. R. B. and discounted by A. T. B. at various banks and paid by H. and J. R. B , although claimed to have been forged by said A. T. B., they, having knowledge that other notes of the same character were made and endorsed in like manner in their names as maker and endorser and failing to warn such banks of such forgery and against taking or discounting such other notes, will be estopped from pleading, as against such banks, that such other notes were forged.  (p. 369.)

4.  EVIDENCE—*Handwriting.*

    In attempting to prove signatures to a paper it is competent to ask a witness, although not an expert in hand-writing "If you know, state in whose hand-writing the signatures are?"  (p. 372 )

Error to Circuit Court, Wood County.

Action by the Parkersburg National Bank against A. J. Hannaman and others.  Judgment for plaintiff, and defendants bring error.

*Affirmed.*

C. D. FORRER and W. E. McDOUGLE, for plaintiffs in error.

WM. BEARD and F. P. MOATS, for defendant in error.

McWHORTER, JUDGE:

This was an action of debt brought by the Parkersburg National Bank, of Parkersburg, against A. T. Barrett, J. R. Barrett and A. J. Hannaman upon a protested note purporting to have been made by A. J. Hannaman payable to the order of J. R. Barrett and A. T. Barrett and by them endorsed, for $1,000 dated January 17, 1901, negotiable and payable ninety days after its date at the Citizens National Bank of Parkersburg.

The defendants, A. J. Hannaman and J. R. Barrett, filed their respective pleas denying their signatures on said note as maker and endorser and the defendant A. T. Barrett filed a plea that he had been adjudicated an involuntary bankrupt. The issue was tried before a jury as to the defendants Hanna-

man and J. R. Barrett and a verdict returned in favor of the plaintiff for the amount of the note and its interest. The defendants Hannaman and J. R. Barrett excepted to various rulings of the court and in the course of the trial took six several bills of exceptions to such rulings which were made a part of the record.

Bill of exceptions No. 1 questions the rulings of the court in giving instructions on behalf of the plaintiff, Nos. 1, 2, 3 and 4.

Instruction No. 1 is as follows: "The jury are instructed that a preponderance of the evidence does not imply a majority of the witnesses. The jury is the judge of the weight of the evidence and the credibility of each witness, and in deciding upon the weight of evidence, the jury may take into consideration the *qualification* and interest of each witness, and its conclusion must be formed after considering the weight of all the testimony offered for both the plaintiff and the defendants." An especial objection is raised to this instruction because it is said "the jury may take into consideration the qualification and interest of each witness," &c., insisting that the word "qualification" is synonymous with the the word "competent" or "competency," thus leaving the competency of the witnesses to the judgment of the jury. In the connection in which the term "qualification" is used in the instruction, it cannot have the meaning insisted upon by the defendants. In *Railway Co.* v. *Whitehead*, 71 Miss. 451, at page 452, it is said: "The evidence of expert witnesses is to be treated by the jury precisely as other testimony. Its value may be very great, or it may be of little worth. It may be conclusive, or it may be not even persuasive. Its weight will be determined by the character, the capacity, the skill, the opportunities for observation, and the state of mind of the experts themselves, as seen and heard and estimated by the jury, and, it should be added, by the nature of the case and all its developed facts." It will be there seen that the weight of the testimony will be determined by the jury by the character, the capacity, the skill, the opportunities for observation, and the state of mind of the witnesses. These matters to be considered by the jury are not to test the competency of the witnesses to testify generally but to enable the jury to determine the weight to be given to the evi-

dence given by them. While it is for the court to determine the competency of the witnesses to testify, the value of the testimony given by such witnesses is a question for the jury. In *Carter* v. *Baker*, 1 Sawyer 512 (U. S. Cir. Ct.,) it is held: "The testimony of experts is to be considered like any other testimony; is to be tried by the same tests and receive just so much weight and credit as the jury may deem it entitled to when viewed in connection with all the circumstances." In *Thompson* v. *Ish*, 99 Mo. 160: "The court must determine, in the first instance, whether a witness who is offered as an expert possesses the proper qualifications, but the value of the testimony of such witness is a question for the jury, and depends upon the skill of the witness in his profession, the extent of which may be shown by one who speaks from knowledge." The appellants cite several authorities to the effect that it is the province of the court and not of the jury to decide upon the competency of witnesses, and this, as a rule, is not disputed; but the instruction clearly intends that the jury shall consider such qualities in witnesses to enable them to give due weight and credence to their testimony, and it is not for them to decide and they could not have so understood the instruction as to authorize them to pass upon the competency of the witnesses to give evidence. The setting of the word "qualification" in the instruction carries with it the intention of the court so that the mind of the layman would give it the common-sense meaning intended to be conveyed to the minds of the jury.

The instruction No. 1 is further objected to because "it tells the jury what is not a preponderance of the evidence, but did not tell them what is meant by 'a preponderance of the evidence,' nor does it tell them that they should be guided by a preponderance of the evidence in determing upon their verdict." The court merely instructed the jury that a majority in number of witnesses does not necessarily make a preponderance of evidence; in other words, the weight of the evidence is not measured by the number of witnesses but by the credibility of the witnesses. Then they are further told that they must arrive at their conclusion after weighing all the testimony offered by both parties and this weight of testimony is taken from the credibility of the witnesses testifying in the presence of the jury, the estimate of

their character, capacity, skill and trustworthiness being made by the jury. It would seem to be a reflection upon the intelligence of the jury to question their ability to understand the meaning of a preponderance of the evidence, or that when they are instructed to weigh all the evidence adduced before them, to question their ability to know what is intended by weighing the evidence. The evidence on one side of the case is placed in one of the balances and the evidence on the other side in the other balance and the average man can certainly understand that the stronger and weightier evidence, that is, that which is most probable and reasonable, will bring down the scale; that when the heavier brings down one side of the balance the other or lighter goes up showing an inequality in the weight in favor of the one party or the other.

The exception to instruction No. 2 is not insisted upon and we see that no valid objection can be made thereto as the jury is only told that if they believe from the evidence that the names of Hannaman and J. R. Barrett, as signed and endorsed on the note, are in the handwriting respectively of said defendants they must find for the plaintiff. This would make the plaintiff's case if proven, without reference to the question of ratification or consent in case the signatures had been made by others or another for them and recognized or acquiesced in by them and treated as their own act.

Instruction No. 3 is complained of because "It tells the jury that the witnesses who testified in this case as experts in hand-writing have given only their opinion as to the genuineness of the signatures of the note in controversy, and that so far as they testify as experts they do not pretend to testify from actual knowledge." Some of the witnesses testified by comparison of hand-writing on the note sued upon with the signatures on the pleas filed by the defendants Hannaman and J. R. Barrett, which testimony would be in the nature of expert testimony, and the instruction is only to impress upon the minds of the jury "that in so far as the witnesses testified as experts they do not pretend to testify from actual knowledge." From this it is plainly implied that the jury must give full consideration to the testimony of such witnesses and of all witnesses when testifying from their actual personal knowledge. Counsel for defendants say:

"The defendants in this case were entitled to have the jury consider the personal knowledge which these witnesses had of the hand-writing and signatures of A. J. Hannaman and J. R. Barrett, yet, the court denied them that right by giving said instruction No. 3 which virtually told the jury they could not consider the evidence of any of the witnesses so far as they testify from their personal knowledge." The instruction does not · call to the attention of the jury the testimony of witnesses based upon their personal knowledge and this was unnecessary as every juror, and, indeed, every person knows that the main purpose of examining witnesses, except when examined especially and only as experts, is to ascertain their personal knowledge of facts in the case, and if anything could be implied from the instruction relative to the personal knowledge of the witnesses it would be that the jury must consider such testimony. If there was any question in the minds of counsel for defendants, it was their right and privilege to have asked the court to instruct the jury that it was their duty to consider testimony given on the personal knowledge of the witnesses. It was certainly not the duty of the court to give such instruction without request from one of the parties. The court may properly instruct the jury on any question of law when in its opinion justice requires, although it be not asked by either party. *Blunt* v. *Commonwealth*, 4 Leigh 689, 26 Am. Dec. 341. But it is not error to omit giving an instruction without being asked to do so. *State* v. *Cobbs*, 40 W. Va. 718, 22 S. E. 310; *Dejarnette* v. *Commonwealth*, 75 Va. 867, 877; *Womack* v. *Circle*, 29 Grat. 192; *Kitty* v. *Fitzhugh*, 4 Rand. 600. Hughes on Instructions to Juries, section 7 says: "Specific or more particular instructions must be requested by the party desiring them, although a statute requires the court to instruct the jury on all material issues. Where the instructions correctly state the law applicable to the case as far as they go, then a party will not be heard to complain because the charge may be incomplete or not sufficiently specific." And authorities there cited. In 18 Cyc. 1504 a good definition of expert testimony is given together with the authorities upon which it is based. And in 15 A. & E. E. L. 263, in treating of expert testimony by comparison of handwriting, it is said: "In a sense all evidence of handwriting, except where the witness saw the document written,

is in its nature comparison, inasmuch as a witness called upon to testify as to whether a document is in the hand-writing of a particular person must necessarily arrive at his conclusion by a comparison of the writing in question with other writing proved or admitted to be that of such person, or with an examplar of such writing in his own mind, derived from previous knowledge. By comparison of hand-writing, however, in a strict or technical sense, is meant an actual production and comparison of two or more instruments or signatures as a means of ascertaining whether they were written by the same person." Some of the witnesses in case at bar testified by comparison as well as from personal knowledge, and the instruction only tells the jury that in so far as witnesses testified as experts they did not pretend to testify from personal knowledge; and it cannot be undersood therefrom that they are not to consider all the evidence given from personal knowledge.

Instruction No. 4, set out in bill of exceptions No. 1, only instructs the jury that in case they find for the plaintiff they are to allow a certain credit to the defendants, proved to have been paid as of the 11th day of April, 1902, of which defendants cannot complain and which is not urged by them in their brief.

Bill of exceptions No. 2 complains of the rulings of the court in refusing instructions Nos. 3 and 4 offered on behalf of the defendants, both to the same effect. No. 3 applying to the defendant J. R. Barrett and No. 4 to the defendant Hannaman, wherein the jury are told that unless the plaintiff has proven to the satisfaction of the jury by a preponderance of evidence that the names of defendants Hannaman and J. R. Barrett signed to the note in question as maker and endorser are in the hand-writing of such maker and endorser, then they must find in favor of the defendants respectively. It is claimed by the defendants that the issue is distinctly made by the defendants by their affidavits separately as to the handwriting of the defendants upon the note as maker and endorser respectively, and the instructions are asked upon the theory that the issue in the case is narrowed to the question of the hand-writing of the defendants in making their signatures. By reference to the affidavits filed putting in issue the making of the note and endorsing of the

same, defendant Hannaman makes oath that the name "A. J. Hannaman"signed as maker of the note is not in his hand-writing, "that said signature to said note as maker was not made by him nor by any other person with his consent or permission." And the affidavit of defendant J. R. Barrett concerning the name of "J. R. Barrett" endorsed across the back of said note is to the same effect, that the endorsement "is not in his hand-writing, that said endorsement was not made by him nor by any other person with his consent or permission." So it will be seen that the issue is broader than as to whether the hand-writing was that of the defendants themselves, issue being joined upon said pleas. There was evidence tending to show that the defendants, Hannaman and J. R. Barrett, in the spring of 1900 had paid notes which had been discounted at several of the banks in Parkersburg, and some at the plaintiff bank, the signatures to which they had denounced as forgeries by the said A. T. Barrett, the same person who it is attempted to show had forged their names to the note here in controversy, and these instructions, that in case the jury found the one single fact that the names of maker and endorser were not in the hand-writing of the defendants respectively they should find for the defendants, were confining the issue to this particular fact leaving out the liability of the defendants in case the jury should be satisfied that defendants had authorized another person to sign their names or had, in any way, ratified the act. The instructions were binding upon the jury in case they found that one fact in favor of defendants. "An instruction which singles out certain facts and makes the case turn on them, ignoring other material facts of the case, is erroneous." *Price* v. *Ry. Co.*, 46 W. Va. 538; *Claiborne* v. *C. & O. Ry. Co.*, 46 W. Va. 363; (Syl. Pt. 3;) *Bently* v. *Fire Ins. Co.*, 40 W. Va. 729; *Bowlin* v. *Creel*, 63 Mo. App. 229.

Bill of exceptions No. 3 complains of the instructions given by the court in response to the jury's request, through their foreman, after they had been sent to their room, stating that the defendants had testified that the note was not signed by them or with their knowledge or consent and wanted to know what "knowledge and consent" means, and how far the law goes upon that point. That the jury "Understood for instance that nine months previous to this time he had

been signing their names and not making the fact known—whether that constituted consent for him to keep on signing their names." Whereupon the court on its own motion instructed the jury that if they believed from the evidence that the signature "A. J. Hannaman" and endorsment "J. R. Barrett" to the note in question were forgeries then they must find for the defendants or defendants whose names they believe to have been so forged, unless they further believe from the evidence that said signature and endorsement or either of them were made with the knowledge or consent of, or having been made without such knowledge or consent were subsequently confirmed by said defendants or either of them, and that whether or not such knowledge or consent, or such a confirmation existed was a question for the jury under the evidence.

The court also instructed the jury by its instruction No. 3 that if they believed from the evidence that in July or August, 1900, the said defendants Hannaman and J. R. Barrett knew that the defendant A. T. Barrett had theretofore forged their names as maker and endorser to a number of notes which notes had theretofore been discounted at various banks, and if the jury believed from the evidence that any of such notes had been discounted at the plaintiff bank and that Hannaman and J. R. Barrett paid and assumed said notes in the plaintiff bank notwithstanding said forgeries and did not notify or warn said bank of said forgeries or warn it not to thereafter take and discount any paper on which their names appeared as maker or endorser in conjunction with the name of A. T. Barrett, then the jury had a right to consider such failure to notify or warn the plaintiff bank of such forgeries in determining the question of the knowledge and consent of the said Hannaman and J. R. Barrett of and to the making and endorsing of the note in question. It is contended by defendants that these instructions were erroneous because they claim that the only question before the jury was as to the signature being in the hand-writing of the defendants Hannaman and J. R. Barrett respectively. We have shown hereinbefore that the pleadings were not confined to that one question as appears from the affidavits of said two defendants. And it is claimed further that there was no evidence upon which to base said instructions; and it is insisted that even

though the evidence should disclose that these signatures were forgeries and that Hanaman and J. R. Barrett knew that they were forgeries they could not under the evidence have by any acts ratified or confirmed the same for the reason that the only motive for ratification would be to conceal a crime and no evidence in the record to show that the plaintiff was induced by any act of Hannaman or Barrett to change its legal position or to lose or impair any of its legal rights. If the defendants had notified the plaintiff bank of the forgeries and warned them against discounting the notes instead of paying off notes of the same character after defendants had denounced them as forgeries, it is not at all probable that the plaintiff bank would have discounted the note sued upon here. Defendants cited several authorities to sustain their position that the defendants could not have ratified the making and endorsing of the notes because the only motive for such ratification would be to conceal a crime. These authorities chiefly do not support the contention of defendants. We find, upon examination of the authorities touching that point, that there is a great diversity of opinion among the courts. In *Henry* v. *Heeb*, 5 Am. St. 613, 114 Ind. 275, a case cited by defendants' counsel, it is held: "There can be no ratification of a forged promissory note which can be held binding upon a person whose name was forged, in the absence of an estoppel *in pais*, or without a new consideration for the promise." Defendants also cite *McHugh* v. *County of Schuylkill*, 5 Am. Rep. 445, 67 Pa. St. 391, where it is held: "The ratification of the signing of a bond, by an obligor whose signature was forged, does not render him liable thereon, there being no new consideration". In this case it is said in the opinion, "the whole testimony which is relied on to establish the plaintiff's liability, are vague conversations and declarations, from which approval, acquiescence of ratification are inferred." In the case of *Lewis* v. *Hodapp*, 56 Am. St. 295, 14 Ind. App. 111, cited by defendants, it is held: "A party who, after maturity of a note, with full knowledge that his name is attached thereto, admits his liability thereon and that he will stand good for it is not thereby estopped from claiming that his signature was forged, although the holder extends the time of payment, unless such extension is induced by such admissions." At

the end of said case in a note attached, we find: "If the maker of a note acknowledges to one intending to purchase it that he has no defense, he precludes himself from afterward setting up any defense when sued on the note then existing within his knowledge; *Maury* v. *Coleman*, 24 Ala. 381; 60 Am. Dec. 478; *Weaver* v. *Lynch*, 25 Pa. St. 449; 64 Am. Dec. 713, and note; *Rose* v. *Teeple*, 16 Ind. 37; 79 Am. Dec. 403; *Brooks* v. *Martin*, 43 Ala. 360; 94 Am. Dec. 686. In an action on a promissory note against a maker whose signature was forged, it appeared that the defendant had said that the note was all right and that he would pay it, thereby inducing the plaintiff to omit to collect the note of the other maker who afterward became insolvent and absconded. It was held that the defendant was estopped from denying the execution of the note: *Hefner* v. *Dawson*, 63 Ill. 403; 14 Am. Rep. 123; *Hefner* v. *Vandolah*, 62 Ill. 483; 14 Am. Rep. 106, and note. To the same effect see *Rudd* v. *Mathews*, 79 Ky. 479; 42 Am. Rep. 231, and note. See, also, the note to *Ray* v. *McMurtry*, 83 Am. Dec. 324." The case of *Bowlin* v. *Creel*, 63 Mo. App. 229, a case very similar to the case at bar, was an action upon a promissory note alleged to have been executed by defendants, three brothers— John E., James H., and W. F. Creel, the latter two filed separate answers under oath denying the execution of the note, John E. failed to answer. The plaintiff replied to the answers of the two defendants admitting that said defendants did not sign their names to the note, nor, at the time, authorize anyone to do so for them; and averred that John E. Creel signed the names of said defendants and that subsequently each of the said two defendants, with full knowledge of all the facts, ratified and approved the act of John E. Creel and promised to pay said note. It was held that the defendants were liable as ratifying the signing. In *Wellington* v. *Jackson*, 121 Mass. 157: "One who, knowing the signature to a promissory note to be forged, and intending to be bound by it, acknowledges it as his own, assumes the note as his own and is bound by it, just as if it had been originally signed by his authority." Citing *Greenfield Bank* v. *Crafts*, 4 Allen 447; *Bartlett* v. *Tucker*, 104 Mass. 336, 341. The authorities on this point are very conflicting but all seem to recognize the doctrine of estoppel, and the defend-

ants, having admitted the payment of notes of the same character as the one here in question, denounced by them as being forged, and failing to warn the bank against taking or discounting such notes, will be estopped from pleading that the note was forged.

It is further insisted that the court erred in failing to explain to the jury, in response to their request, the meaning of "knowledge and consent." The court, in the instructions given in response to the questions propounded by the jury, told them what facts they had a right to consider in determining the question of the knowledge and consent of said Hannaman and Barrett of and to the making and endorsement of the note in question. As will appear from the instructions given by the court, as hereinbefore stated, it can hardly be presumed that the jury did not understand, in a general way, what the phrase or expression "knowledge and consent" means. We think the court said to them all that was necessary on that subject.

It is complained that the court did not call the attention of the jury to section 31, chapter 116, of the Code, which provides that: "A juror knowing anything relative to a fact in issue, shall disclose the same in open court, but not to the jury out of court; and the court shall inform the jury of this provision:" in response to a question by juryman Beckwith, when he says: "We want to determine what the issue was on which we are to render a verdict—whether it was the genuineness of that signature or whether we could go farther and make witnesses of ourselves and determine whether these men objected to A. T. Barrett signing their names to the paper or whether it was agreeable." There is no intimation in the language of juryman Beckwith that any of the jurors knew anything about the facts of the case outside of the evidence which had been given at the bar. It is presumed that in the impanneling of [the jury they had been fully interrogated as to the knowledge they might have of the facts in the case, or whether they knew anything about the case. Evidently what the jury wanted to know was what inferences they would be entitled to draw from the evidence given in the case, including statements by Hannaman and Barrett that in the summer of 1900, perhaps May or June, they had knowledge of other similar notes which had been made and

endorsed in like manner and which they claimed were forgèd by A. T. Barrett. It is evident that this was the meaning of the juror in using this language from the further language used when he wanted to know whether they could determine from the conduct of Hannaman and Barrett whether they objected to A. T. Barrett signing their names to paper, or whether it was agreeable. The inquiry of juryman Beckwith was to have the court instruct them as to the law of acquiescence and acknowledged course of conduct on the part of Hannaman and Barrett to the signing of their names to the paper by A. T. Barrett, which they testified was forged and which they had known, without giving any warning to the plaintiff bank of such forgery. A. J. Hannaman had testified that in July or August, 1900, there were many notes of this character forged by A. T. Barrett to which forgeries said Barrett had then acknowledged; and was asked whether any of them were in the Parkersburg National Bank at that time and stated, there were, and stated that they were in different banks; and says he never went to the bank himself after July or August, 1900, until after he got notice of the maturity of the note dated January 17, 1901.

J. R. Barrett testified that about May or June, 1900, when he and Hannaman received a letter from cashier Shattuck of the Citizens National Bank, was the first they knew of the forgeries and that they first denounced the forgeries before the grand jury, that he did not remember the time he was before the grand jury but it was when the note here in suit was before the grand jury, and that was the first time they publicly denounced them as forgeries. Said he was ashamed after he found it out but when summoned before the grand jury he did what he did because he was compelled to do it. He says they told Shattuck the notes were forged but that they had to assume the payment of them there to save the forger from shame.

The defendants knew in 1900 that A. T. Barrett had forged their names to a number of notes that were held by the banks in Parkersburg, some of which were held by the plaintiff bank and were paid by the defendants, the maker and endorser.

Bills of exceptions Nos. 5 and 6 go to the rulings of the court upon the admission of evidence claimed by the defendants to

be improper to go to the jury. In bill of exceptions No. 5 it is claimed that the court erred in permitting, over the objections of the defendants, the following question to be asked of the witness C. A. Bukey upon re-direct examination: "To what extent does a man always form his letter in the same manner while writing his name?" The witness answered, "My impression is that a man's signature varies considerably from time to time in absolute formation." Defendants leave us in the dark as to the ground of objection to this question and answer as they say nothing about it in their brief. It may be that their objection was based upon the ground that the witness did not claim to be an expert, and yet he stated that he had been connected with the Parkersburg National Bank since the year 1880, having been cashier since April 1904; that fifteen years before his election as cashier he had held the position of assistant-cashier and previous to that he was individual book-keeper and discount clerk; and that as discount clerk his duties were to enter and take care of the discounted papers and as assistant cashier he had the general management of the office part of the bank, the office work. A sufficient experience to entitle him to be examined as an expert witness.

Bill of exceptions No. 6 complains of the rulings of the court in the examination of A. T. Barrett, one of the defendants and a witness for plaintiff, who was shown the note sued upon in this case "signed A. J. Hannaman and endorsed J. R. Barrett and A. T. Barrett and I will ask you to take that note and look at the same and say in whose hand-writing those signatures upon that note are?" Which question being objected to by Hannaman and J. R. Barrett the plaintiff propounded to the witness the question, "If you know, state in whose hand-writing they are?" To which question defendants objected and the objection was overruled and the witness answered, "That's A. J. Hannaman's signature and J. R. Barrett's signature on the back." The witness was not examined as an expert as to the hand-writing but he was asked to state of his own knowledge in whose hand-writing the signatures were. He was not asked how he knew, which might have been done on cross-examination. He may have known that they were the signatures of the parties purporting to have signed as maker and endorser by seeing them write their

names upon the paper, in that case he would not be testifying as an expert. The witness had a right to state of his own knowledge what he knew. If the defendants questioned it they could, on cross-examination, have brought out the fact that he did not see them place the signatures there in their own hand-writing, then it would be proper to question him as to how he knew it. But the defendants did not elect to question him as to how he knew it. If he did not see them write their names he could only know it by comparison in his own mind, having seen them write their names, or by comparison with signatures admitted to have been made by them. There being a way by which he might have the knowledge, although not as an expert in hand-writing, he had a right to state what his knowledge was, and the exception was not well taken. The jury was fully informed as to the interest of the witness A. T. Barrett in the issue, that he was charged with the forgery of the note in question, and with the motive which would prompt him to testify to the genuineness of the signatures of the maker and endorser of the said note.

Bill of exceptions No. 4 is that the court erred in refusing to set aside the verdict and grant them a new trial because: 1st, the court erred in instructing the jury; 2nd, the verdict was without evidence to support it; and 3rd, the court permitted improper evidence to go to the jury. We have already disposed of the first and third assignments of error set out in this bill of exceptions.

The evidence in the case ·is very conflicting and as to the weight and credibility thereof it is purely a question for the jury. "The credibility of witnesses is a question for the jury."—*Harrison* v. *Brock*, 1 Munf. 22. "The jury is the sole judge of the credibilty of contradicting witnesses and of the weight to be given to their testimony."—*Young* v. *Railroad Co.*, 44 W. Va. 218, (28 S. E. 932.) And in *Bass* v. *Norfolk Railway & Light Co.*, 100 Va. 1, (40 S. E. 100,) it is held: "The inferences to be drawn from the evidence must be certain and incontrovertible, or they cannot be decided by the court, but must be left to the jury." And other authorities cited in 5 Va. and W. Va. Dig. 8762. The jury had before them all the witnesses testifying in the case and had the advantage of their appearance, conduct and de-

meanor on the stand and were fully advised as to their interest, if any, in the result of the issue, and the judge who conducted the trial refused to set aside the verdict. This being the case, this Court has often held that it will not disturb a verdict rendered under such circumstances unless it clearly appears to the Appellate Court that the circuit court erred in refusing to set aside the verdict.

For the reasons herein given the judgment must be affirmed.

*Affirmed.*