STATE OF WEST VIRGINIA

*v.*

VURGIS BLANKENSHIP

(No. 10404)

Submitted January 22, 1952. Decided March 4, 1952.

2

*W. H. Ballard, II, Sherman H. Ballard,* for plaintiff in error.

*William C. Marland,* Attorney General, *George W. Stokes,* Assistant Attorney General, for defendant in error.

HAYMOND, JUDGE:

The defendant Vurgis Blankenship was indicted for the murder of Glen Blankenship in the Criminal Court of McDowell County. He was tried and by a jury found guilty of murder of the second degree. After the jury returned the verdict of guilty and a defense motion to set it aside had been overruled by the court but before sentence for the crime for which the defendant had been convicted was imposed, the prosecuting attorney of McDowell County informed the court that the defendant had been twice before convicted in the United States of a crime punishable by confinement in a penitentiary and, upon being asked if he was the same person who had been previously convicted of each of two offenses punishable by confinement in a penitentiary, the defendant in open court acknowledged that he was the person who had been pre-

viously so convicted. The court then sentenced the defendant under the habitual criminal statute, Section 19, Article 11, Chapter 61, Code, 1931, as amended, to imprisonment for life in the penitentiary of this State. Upon writ of error to the foregoing judgment the Circuit Court of McDowell County set aside the sentence of life imprisonment on the ground that the defendant, before he was questioned as to his identity in connection with the two prior convictions, had not been duly cautioned as required by the statute, but refused to set aside the verdict and grant the defendant a new trial, and remanded the case to the criminal court for the entry of a judgment of imprisonment in compliance with the requirements of the habitual criminal statute. Upon the remand the defendant, after being duly cautioned, again acknowledged in open court that he was the same person who had been twice previously convicted in the United States of a crime punishable by confinement in a penitentiary. The court by final judgment entered April 9, 1951, sentenced the defendant to imprisonment for life in the penitentiary of this State. The Circuit Court of McDowell County refused to grant the defendant a writ of error by order entered April 9, 1951; and to that judgment this Court granted this writ of error upon the petition of the defendant.

About five o'clock in the evening of Saturday, April 8, 1950, the defendant, a resident of Blackie, Virginia, shot and killed Glen Blankenship on land owned or occupied by Claude Blankenship, near Paynesville in the Panther Creek section of McDowell County, West Virginia. The pistol shot which killed Glen Blankenship was fired by the defendant while he was standing within ten or twelve feet of his victim. The bullet which caused the death of Glen Blankenship entered the left side of his face near the corner of his mouth, took an upward course, and did not emerge from his head.

Earlier that day the defendant, who had spent the preceding night at the home of his father, went on foot from his father's home to the home of Charlie Blankenship, a

distance of about a mile and a quarter. When the defendant left his father's home he took with him a pistol and a pint of liquor. After the defendant had been at the home of Charlie Blankenship for about an hour, Glen Blankenship and two companions also came there. Glen Blankenship owned a fractious mule which he had left with Charlie Blankenship, his uncle. A few minutes after Glen's arrival he, his companions, Charlie Blankenship and the defendant went to a barn, got the mule and some of the group tied him to a cherry tree. Glen Blankenship whipped the mule and sometime during these activities both Glen Blankenship and the defendant rode the mule in their efforts to "break" him. The defendant and Glen Blankenship and the other members of the group consumed most or all of the liquor of the defendant and a portion of a pint which Glen Blankenship had, and the defendant then left Glen Blankenship and Charlie Blankenship and got an additional one half gallon of liquor which he kept somewhere on a ridge nearby. Upon his return from the ridge with the liquor the defendant, Glen Blankenship and Charlie Blankenship went to the land of Claude Blankenship where the shooting later occurred and which was located about two and a quarter miles from the home of the father of the defendant. In going from the home of Charlie Blankenship to the home of Claude Blankenship, the defendant rode a mule owned by Glen Blankenship and Glen Blankenship rode the mule which they were trying to "break". After arriving at the home of Claude Blankenship they rode some distance down a nearby road where they met Lacy Blankenship and some of his companions. The defendant appears to have returned to the home of Claude Blankenship where he and Charlie Blankenship ate supper and Glen Blankenship and Lacy Blankenship continued to ride the mules along the road. They later started back to the Claude Blankenship home, met the defendant somewhere on the road and with him joined Charlie Blankenship and Claude Blankenship who were near a barn on the Claude Blankenship land located about two hundred yards from his home. During their association together, until just before the shooting, there was no

indication of any ill feeling between the defendant and Glen Blankenship who was known to his companions as "Junior" or "Bug" Blankenship; and he, the defendant and Charlie Blankenship had frequently spent Saturdays and Sundays together.

Soon after the defendant, Glen Blankenship, Charlie Blankenship, Claude Blankenship and Lacy Blankenship came together near the barn five or six ducks appeared on the farm. At that time Claude Blankenship said he would sell all the ducks for seventy five cents apiece but would not sell any unless he sold all of them. During this conversation the defendant said he would bet a dollar that he could shoot the "head off" one of the ducks. Claude Blankenship told him not to do that. Then Glen Blankenship offered to bet the defendant that he "could better" the defendant's shot. The bet was made and the defendant and Glen Blankenship each put a one dollar bill on the ground. Someone made a target, consisting of a cigarette package on a board, and Lacy Blankenship placed it against some timber across a road between the barn and the target at a distance of about forty two feet from the road. The defendant and Glen Blankenship then went near the barn and the defendant stooped or "hunkered down" to shoot. Glen Blankenship suggested that they stand and shoot. The defendant refused to do this and asked Glen Blankenship, who did not have a pistol or other firearm, what "gun" he would use. He said he would shoot the defendant's "gun" and the defendant replied "No, I haven't got but three cartridges and I don't want to shoot all my cartridges". Glen Blankenship then said he would "call the bet off" and that he would "have the dollar" and the defendant answered: "Well, I reckon not". As to the conversation which then took place between Glen Blankenship and the defendant the testimony of the witnesses is somewhat conflicting, but it is undisputed that during this conversation between them the defendant, who was facing the target and pointing the pistol, which he held in his hand, in that direction, turned and pointed the pistol toward Glen Blankenship, Lacy Blankenship, Charlie

Blankenship and Claude Blankenship, who were standing near each other, and at that time fired the shot which struck and instantly killed Glen Blankenship.

Charlie Blankenship, an eye witness produced by the State and its most important witness, on his examination in chief gave this version of the shooting:

"Q. What, if anything, did Glen say to Vurgis when Vurgis refused to let him have his gun? A. Well, he said, the first thing he said, we were standing there, and the first thing that made me take thought about trouble or anything, he asked Vurgis to take the gun off of him. Vurgis said, 'I ain't got my gun on you, Bug.' That was what he called him, a nickname, Junior and Bug, and he said, 'I ain't got my gun on you, Bug.' Q. Did he have his gun on him? A. Yes, sir, it looked to me like he had the gun up this way in his hand. Q. Was it pointed toward Glen Blankenship? A. It was pointed towards us all, not at Glen, it was pointed toward me. We were standing there right side by side. Q. When he asked Vurgis to take the gun off of him, did Vurgis take it off of him? A. Well, Vurgis said, 'I ain't got the gun on you, Glen,' and the gun kinda turned this way and he said something about 'Let's shoot this spot and you get another gun,' and that was all, but he said, 'Nobody ain't going to shoot with this gun.' Q. Now, Charlie, Glen told him to keep the gun off of him? A. Yes, sir, and told him he was 'yaller' if he didn't take it off of him. * * *. Q. What else did he tell him, to put the gun down and they would fight it out? A. No, sir, he never said nothing like that. * * *. Q. Then you were facing him were you not? A. Yes, sir. * * *. Q. Did Vurgis say anything? A. You mean after the gun went off? Q. No, immediately prior to the gun's going off? A. No. sir, he never said nothing until after the shot was fired. * * *. Q. How far was Glen from Vurgis at the time he was shot? A. He was about ten or twelve feet. * * *. Q. Tell the jury where he was shot? A. Yes, sir, right in the corner of the mouth, right there, on the left side. Q. After Glen fell, did he move at all? A. No, sir, he never even batted his eyes. I was looking right straight at him. Q.

What did Vurgis do?. A. Vurgis picked his dollar up and reached in a pair of saddle pockets and got a drink of liquor in a half gallon fruit jar and went up the hollow." On cross-examination Charlie Blankenship also stated: "Q. Vurgis said, 'I haven't got my gun on you,' and then Glen said, 'You are yellow if you don't take that gun off me?' A. If you don't take the gun off me, yes, sir. Q. Did anybody seem to be mad then. A. That was the only mad words I heard said * * *. Q. And at that time is when the gun went off? A. Yes, sir. Q. And Glen fell to the ground? A. That is correct."

Lacy Blankenship another eye witness testifying at the instance of the State described the shooting in these words:

"Q. After you put the spot up there at the end of the timber, then what happened? A. Vurgis and Junior walked up near the barn door and Vurgis hunkered down to shoot, down like me on the ground, and when he hunkered down to shoot, Junior said, 'Let's stand up and shoot off-hand.' Vurgis said, 'No, what kind of a gun are you going to shoot, Junior?' Junior said, 'I am going to shoot yours.' Vurgis said, 'No, you ain't a shootin' mine.' Junior walked back and said 'You are yellow, Vurgis,' and picked up his dollar and throwed the other dollar toward Vurgis and Vurgis turned around with the gun in a direction toward Junior and Junior said, 'Take that gun off of me, Vurgis,' so he turned it back around off of him like he told him. Then I noticed Junior had his pocketbook in his left hand and the dollar bill in his right. Then I heard Junior curse and he said, 'Hold it on me as long as you want to.' About that time the gun fired and Junior fell. Q. After he fell, did he have anything in his hands? A. He still had the pistol in his hand. Q. I mean Glen, did he have anything in his hands? A. Yes, sir, he had the pocketbook in one hand and the dollar bill in the other. Q. And Vurgis had a pistol in his hand? A. Yes, sir. Q. After he shot Glen, what did he do? A. He walked down and said, 'Give me my dollar, Charlie.' Charlie said, 'There it lays.' He got his dollar and walked back to his saddle pockets

and got a car with almost a whole amount of liquor in the car and walked about as far as from that chair there to me and looked back and said, 'Lacy, what have you got to say?' I said, 'I ain't got nothing to say, what can I say about it.' "

Claude Blankenship, also produced as a witness for the State, who was in the group at the scene of the killing but who did not see the defendant fire the pistol, testified that after the defendant refused to permit Glen Blankenship to use his pistol, Glen Blankenship said to the defendant: "I will have the dollar" and "Take that gun off of me". This witness also testified: "I looked back and seen the gun come around back across the road where the target set and I made another step and heard Glen say, 'Hold it on me as long as you want to,' and it went off and I looked back and seen Glen laying there"; and that after the shooting the defendant said: "I killed June Bug. I shot his brains out."

The defendant, testifying in his own behalf, gave this description of the shooting:

"A. And after Claude didn't want us to shoot the duck Junior said, 'I will bet you a dollar I can beat you at a spot.' I said, 'I will call that,' and I throwed a dollar bill on the ground and he throwed a dollar bill on the ground and walked around kind of back of the barn and made a spot. Lacy hung it up and Junior said, 'How are you going to shoot?' I said, 'I am going to hunker down.' He said, 'No, let's stand up and shoot off-hand.' I said, 'What kind of a gun are you going to shoot?' He said, 'I am going to shoot yours.' I said, 'No, I haven't got but three cartridges and I don't want to shoot all my cartridges.' He said, 'Well, we will call it a back out.' I said, 'Suits me.' He said, 'I guess I will have the dollar then.' I said, 'Well, I reckon not.' I thought he was joking. We were always joking. He walked around behind me. I was standing there and he says to me 'Doc, take that pistol off of me.' I said, 'I haven't got any pistol on you, Bug,' I still thought he was joking. I turned around and said, 'I am going to shoot the spot for

fun.' He said, 'Doc, you are yellow.' I had cocked the pistol to shoot at the spot. Q. Did you point it down there? A. When I turned around I did. After he told me to take the pistol off of him and I didn't have any on him and he said, 'You are yellow,' I turned around with the pistol in my hand. Just as I turned around it went off and he fell."

The defendant insisted that no ill feeling existed between him and Glen Blankenship, although he admitted that about three years before the shooting he and Glen Blankenship had had some trouble and that Glen Blankenship had pushed him over a steep bank and caused an injury to his hand. He testified that he and Glen Blankenship had been drinking together frequently during the day and until just before the shooting occurred. He admitted that after he shot Glen Blankenship he picked up the dollar and took a drink of liquor. He further testified that he then went to the home of his aunt at Bradshaw where he spent the night and that he intended to go to the officers of the law and submit to arrest but that before he did so he was arrested by two police officers on the morning following the shooting.

The deputy sheriff who arrested the defendant on Sunday morning, April 9, testified that the defendant told him that he had shot Glen Blankenship, that "he was tired of having his head beat up", and that he did not tell the officer that the shooting was accidental. A witness produced by the State in rebuttal testified that about dark on the evening of the shooting the defendant stopped at her home, told her that he had killed Glen Blankenship, that they had an argument over the shooting match, that Glen Blankenship was jealous of the defendant about a girl, that the defendant told her that he had "shot out" Glen Blankenship's brains, and that the defendant gave her the empty shell and told her to keep it.

At the trial of the case, after a panel of twenty jurors had been accepted as qualified, the attorneys for the State, when handed the list of jurors prepared by the Clerk, took the list from the courtroom and, while absent from the

courtroom and out of the presence of the defendant, in exercising the two peremptory challenges to which the State was entitled, struck from the list the names of two of the jurors, and then returned to the courtroom and delivered the list to the attorneys for the defendant. The attorneys for the defendant challenged the action of the attorneys for the State in striking the names of the two jurors outside the courtroom and out of the presence of the defendant and for that reason moved to dismiss the panel of twenty jurors. The trial court overruled the motion to dismiss the panel, and to that ruling the attorneys for the defendant excepted. The trial court then caused the clerk to prepare another list of the same jurors, and the same two names were struck from the new list by the attorneys for the prosecution in the courtroom and in the presence of the defendant. The new list was then delivered to the attorneys for the defendant who exercised the six peremptory challenges to which he was entitled and struck that number of jurors from the list.

On April 8, 1950, within a few hours after the defendant had shot Glen Blankenship, Charlie Blankenship signed a written statement of the manner in which the shooting occurred which, among others, contained these expressions: "Vurgis held the gun pointed towards his belly and it was cocked. Glen said Dock me and you never did have no trouble, keep that gun off of me that way. Vurgis said, 'I ain't going to let the gun go off until I take a notion for it to go off'. Glen said, 'You must be a little bit yellow. You would throw that gun down and scrap me a little bit as good as I have been to you.' Vurgis then fired the shot and hit Glen near the mouth. * * *. Vurgis kept his eye on me and said Lacy how in the hell you like that. Lacy said nothing." On the day Charlie Blankenship appeared as a witness, but before he testified, he examined the statement and told one of the attorneys for the State that it was true and correct. When testifying during his examination in chief and on cross-examination, however, he did not mention or repeat some of the above quoted portions of his written statement. His testimony was contrary to

his written statement that Glen Blankenship told the defendant that he should "throw that gun down and scrap me a little bit.", that he held the pistol "pointed towards" Glen Blankenship's "belly", and that Lacy Blankenship said nothing to the defendant after the defendant shot Glen Blankenship. At the conclusion of his cross-examination, over the objection of the defendant, the witness was confronted with and interrogated in detail about his written statement which was introduced in evidence by the State. After the witness was questioned about his statement, by an assistant prosecuting attorney, a motion by the defendant that the court withdraw a juror and declare a mistrial was overruled.

The defendant assigns as error the action of the trial court: (1) In denying the motion of the defendant to discharge the panel of twenty jurors from which the trial jury was selected because the names of two jurors on a list of twenty jurors furnished by the clerk were stricken from the list by the attorneys for the State out of the presence of the defendant; (2) in permitting the attorneys for the State to introduce in evidence the signed statement of the witness, Charlie Blankenship, and to examine him about its contents and in refusing a motion by the attorneys for the defendant to declare a mistrial because of the introduction of the written statement of the witness and certain questions asked relating to such statement; (3) in permitting the attorneys for the State to ask the defendant on cross-examination if he had been previously convicted and sentenced to a penitentiary for two designated offenses; (4) in permitting the introduction by the State of certain evidence in rebuttal; (5) in refusing to give certain instructions offered by the defendant; (6) in permitting the attorneys for the State to present to the court, without prior notice to the defendant, information of two former convictions and sentences of the defendant for an offense punishable by confinement in a penitentiary; and (7) in refusing to set aside the verdict of the jury finding the defendant guilty of murder of the second degree upon the trial and in entering judgment upon such

verdict without granting the defendant a new trial after the circuit court had set aside the original judgment which had been entered on such verdict.

The first assignment of error urged by the defendant is without merit. The conduct by the attorneys for the State in taking the list of twenty jurors prepared and furnished them by the clerk from the courtroom and in striking the names of two of the jurors from the list outside the courtroom, did not cause or result in the absence of the defendant during any stage of his trial. Their action in so doing did not constitute any part of the trial. While they were so acting they were, but the defendant was not, absent from the trial. He remained in the courtroom, where the trial was being conducted, and was present in person at every stage of its progress and existence. He was present at the trial, which was halted or suspended by or during the absence of the attorneys for the State, and they, not he, were temporarily absent from it. Their act of striking the names of the two jurors from the list outside the courtroom, during their absence from the trial, was of no legal validity until the list was recognized or accepted, or its use was permitted, by the court. Until it was so recognized or accepted, or so used in the trial, the list, as altered by the attorneys for the State, acquired or possessed no legal force or existence. The action of the trial court in rejecting the list and in requiring the preparation of a new list of the same jurors, which was used in the trial and from which the names of the same two jurors were stricken in the presence of the defendant, during the trial, rendered the original list futile and ineffective and completely eliminated it from the trial. Though Section 2, Article 3, Chapter 62, Code, 1931, provides that a person indicted for a felony shall be personally present during the trial, and *State* v. *Martin,* 120 W. Va. 229, 197 S. E. 727; *State* v. *Howerton,* 100 W. Va. 501, 130 S. E. 655; *State* v. *Snider,* 81 W. Va. 522, 94 S. E. 981; *State* v. *Grove,* 74 W. Va. 702, 82 S. E. 1019; *State* v. *Sutter,* 71 W. Va. 371, 76 S. E. 811, 43 L. R. A., N. S., 399; *State* v. *Sheppard,* 49 W. Va. 582, 39 S. E. 676; and *State* v. *Parsons,*

39 W. Va. 464, 19 S. E. 876, cited and relied on by the defendant, and other cases, recognizing and giving effect to the statute, hold that in a felony case the defendant must be personally present, when anything affecting him is done, from the inception of the trial until the final judgment, and that the record must show his presence, *Dye* v. *Skeen,* 135 W. Va. 90, 62 S. E. 2d 681, the statute and the decisions in those cases do not apply to the action of the attorneys for the State in striking, during their absence from the trial, the names of the jurors from the original list which was not used in the trial but was rejected and eliminated by the court. The action of the attorneys for the State in striking the names of two jurors from the list of a panel of twenty qualified jurors, while outside the courtroom and out of the presence of the defendant who remained in the courtroom in the presence of the court and the jurors, though irregular, does not violate the provision of the statute which requires that a person indicted for a felony shall be personally present during the trial and does not constitute reversible error.

The second assignment of error, advanced by the defendant, is not well founded. Though the general rule is that a party can not impeach his own witness, either in a civil or in a criminal case, 70 C. J. 793; 58 Am. Jur., Witnesses, Section 792; *William James Sons Company* v. *Hutchinson,* 79 W. Va. 389, 90 S. E. 1047; *Lambert* v. *Armentrout,* 65 W. Va. 375, 64 S. E. 260, 22 L. R. A., N. S. 556; *Stout* v. *Sands,* 56 W. Va. 663, 49 S. E. 428; the rule is subject to well recognized exceptions such as entrapment, hostility or surprise, by which the party is mislead and prejudiced by the testimony of a witness called by him. In such instances the party may impeach his own witness to the extent permitted by the trial court in the exercise of its discretion. 70 C. J. 793; 58 Am. Jur., Witnesses, Sections 798, 799. As already pointed out the witness Charlie Blankenship, in his testimony given on his examination in chief, and on his cross-examination by the attorneys for the defendant, omitted any reference to material portions of his previous written statement. His testimony

was contrary to his written statement, on which the prosecution relied, to the extent that he denied that Glen Blankenship, just before the shooting, told the defendant to "throw that gun down and scrap me a little bit.", and that the defendant pointed the pistol "towards" Glen Blankenship's "belly". These facts, contained in the statement of the witness, but omitted from his testimony during his examination in chief and his cross-examination, were material and tend to show that the defendant entertained malice toward Glen Blankenship and that he shot him intentionally. The omission of these facts by the witness constituted surprise to the State and entitled it to contradict the testimony of its witness by introducing his prior inconsistent statement and examining him concerning its contents for that purpose. "A party who is surprised by unfavorable testimony given by his own witness may interrogate such witness as to previous inconsistent statements made by him." Point 2, Syllabus, *State* v. *Swiger,* 105 W. Va. 358, 143 S. E. 85. *State* v. *Justice,* 107 W. Va. 490, 148 S. E. 843; *State* v. *Wolfe,* 109 W. Va. 590, 156 S. E. 56, 74 A. L. R. 1039.

The action of the trial court in permitting the attorneys for the State to ask the defendant on cross-examination if he had been previously convicted and sentenced to a penitentiary for two specific offenses, which forms the basis of the third assignment of error, was proper. "Code, 57-3-6, requires an accused who voluntarily becomes a witness in his own behalf to state in response to questions propounded on cross-examination, whether or not he has been convicted of other offenses." Point 5, Syllabus, *State* v. *Taylor,* 130 W. Va. 74, 42 S. E. 2d 549. *State* v. *McMillion,* 127 W. Va. 197, 32 S. E. 2d 625; *State* v. *Friedman,* 124 W. Va. 4, 18 S. E. 2d 653; *State* v. *Foley,* 128 W. Va. 166, 35 S. E. 2d 854; *State* v. *Mullenax,* 124 W. Va. 243, 20 S. E. 2d 901.

The testimony of Vada Blankenship, a witness produced by the State in rebuttal, challenged by the fourth assignment of error of the defendant, was properly admitted. Upon cross-examination the defendant was interrogated as to certain statements made by him to her at her home

shortly after the shooting, which statements he either denied or did not recall. She was called in rebuttal and contradicted the testimony of the defendant on those matters. Her testimony was proper evidence in rebuttal and was clearly admissible. The admissibility of evidence as rebuttal is within the sound discretion of the trial court, and the exercise of such discretion does not constitute ground for reversal unless it is prejudicial to the defendant. *State v. Scurlock*, 99 W. Va. 629, 130 S. E. 263; *State v. Driver*, 88 W. Va. 479, 107 S. E. 189, 15 A. L. R. 917; *Jones v. Hebdo*, 88 W. Va. 386, 106 S. E. 898.

By his fifth assignment of error the defendant complains of the action of the trial court in refusing to give instructions Numbers 1, 11, 13, 13A, and 14, requested by the defendant.

Instruction Number 1 was a peremptory instruction which would have directed the jury to find the defendant not guilty; and the action of the trial court in refusing to give it was plainly right.

Instruction Number 11 would have told the jury that the highest offense of which the jury could find the defendant guilty was involuntary manslaughter and that the jury could not find him guilty of that offense unless the jury believed that the State had proved beyond all reasonable doubt that the killing of Glen Blankenship was not accidental. The instruction ignores and would have required the jury to disregard evidence produced by the State which tended to show that the defendant killed Glen Blankenship intentionally and maliciously. For this reason it was properly refused. An instruction which ignores material evidence is erroneous and should be refused. *Parkersburg National Bank v. Hannaman*, 63 W. Va. 358, 60 S. E. 242; *Delmar Oil Company v. Bartlett*, 62 W. Va. 700, 59 S. E. 634; *Johnson v. Bank*, 60 W. Va. 320, 55 S. E. 394, 9 Ann. Cas. 893; *Robinson v. Lowe*, 50 W. Va. 75, 40 S. E. 454; *Price v. Chesapeake and Ohio Railway Company*, 46 W. Va. 538, 33 S. E. 255. Refusal of an instruction which ignores or is calculated to minimize material facts which

are supported by substantial evidence is not error. *Shoe-maker* v. *Thomas,* 108 W. Va. 204, 151 S. E. 178.

Instructions Numbers 13 and 13A, which are substantially similar, would have told the jury that if the evidence, taken as a whole, raised a reasonable doubt whether the killing was accidental or intentional the jury should find the defendant not guilty for the reason that the State had failed to sustain its case. The form of each instruction would have tended to mislead the jury and to have led the jury to the belief that the evidence produced by the State was not sufficient to convict the defendant of any offense. For this reason the action of the court in refusing each of the instructions was correct. Instructions which tend to mislead and confuse the jury should not be given. *Franklin* v. *Pence,* 128 W. Va. 353, 36 S. E. 2d 505; *Wilson* v. *City of Elkins,* 86 W. Va. 379, 103 S. E. 118; *Laraway* v. *Croft Lumber Company,* 75 W. Va. 510, 84 S. E. 333; *Mylius* v. *Raine-Andrew Lumber Company,* 69 W. Va. 346, 71 S. E. 404; *Walker* v. *Strosnider,* 67 W. Va. 39, 67 S. E. 1087, 21 Ann. Cas. 1; *Stewart* v. *Doak Bros.,* 58 W. Va. 172, 52 S. E. 95.

Instruction Number 14 would have told the jury that if the jury believed from the evidence that Glen Blankenship was accidentally killed the jury should find the defendant not guilty. Though the instruction contained a correct statement of law the substance of the instruction was fully covered by instruction Number 17 which was offered by the defendant and given by the court. "Duplication of instructions is unnecessary and undesirable." Point 2, Syllabus, *Robertson* v. *Hobson,* 114 W. Va. 236, 171 S. E. 745. *Drake* v. *Clay Hardware and Supply Company,* 110 W. Va. 63, 157 S. E. 35; *Franklin* v. *Pence,* 128 W. Va. 353, 36 S. E. 2d 505; *State* v. *Prater,* 52 W. Va. 132, 43 S. E. 230. When instructions which fairly and clearly state the law of the case are given, it is not error to refuse other instructions dealing with the same point, even though such instructions may be good. *Chesapeake and Ohio Railway Company* v. *Johnson,* 134 W. Va. 619, 60 S. E. 2d 203; *State* v. *Driver,* 88 W. Va. 479, 107 S. E. 189, 15 A. L. R. 917; *McCray* v. *Town of Fairmont,* 46 W. Va. 442, 33 S. E. 245.

There is no merit in the sixth assignment of error presented by the defendant that he should have been previously notified that the State would present information of his two former convictions. The applicable statute, Section 19, Article 11, Chapter 61, Code, 1931, as amended, makes no provision for any such notice. The information was presented to the court by the prosecuting attorney immediately after the defendant was convicted and before he was sentenced and during the same term of court at which he was convicted as provided by the statute. The defendant was personally present when the information was presented and he, of course, knew whether he had been previously convicted as charged. He was also duly cautioned and freely acknowledged in open court that he was the same person who had been twice previously convicted and sentenced for an offense punishable by confinement in a penitentiary. The requirements of the statute were fully satisfied and the sentence of life imprisonment imposed by the court was in all respects valid.

The seventh and final assignment of error is also groundless. The Circuit Court of McDowell County, in setting aside the original sentence of life imprisonment, for the reason that the defendant had not been previously cautioned as required by the statute refused to set aside the verdict and remanded the case to the trial court for the imposition of a valid legal sentence. As the evidence fully sustains the verdict of the jury, and as the trial was free from prejudicial error, the action of the circuit court, and the similar subsequent action of the trial court, in refusing to set aside the verdict and to award the defendant a new trial were correct. When there is no error in the trial of a criminal case except the entry of a judgment imposing sentence, such error does not merit a new trial. In such case the judgment should be reversed and proper judgment of sentence upon the verdict should be entered by the trial court. *State* v. *Justice,* 130 W. Va. 662, 44 S. E. 2d 859; *State* v. *Fisher,* 126 W. Va. 117, 27 S. E. 2d 581; *State* v. *McKown,* 116 W. Va. 253, 180 S. E. 93; *State* v. *Coontz,* 94 W. Va. 59, 117 S. E. 701.

Being free from prejudicial error, the judgments of the circuit court and the criminal court of McDowell County are affirmed.

*Affirmed.*